Nanette Dembitz, J.
The juvenile delinquency petition against the 15-year-old respondent charged him with knowingly selling heroin and possessing heroin with intent to sell. After a finding of his guilt of acts that would constitute a narcotics felony if he were an adult, his pretrial release on parole was continued on the condition of his attendance at a rehabilitative program, pending disposition (the equivalent of sentencing in an adult criminal case). The issue now is whether the court should order respondent’s coerced "placement”, which substitutes in juvenile proceedings for adult imprisonment, or should merely place him on probation.
A. respondent’s delinquency and the public safety
In opposing respondent’s placement, his able Law Guardian argues against an inference that respondent presents a danger to the public, on the ground that his recent record consists of only the one drug crime here involved, which occurred more than eight months ago. However, a premise of the Penal Law is that the commission of a crime tends to show a criminal propensity; otherwise the public would never require protection from a criminal until he collected a series of convictions. The reasonableness of the inference from a person’s commission of a crime of his propensity to commit another, is attested by the restriction in a criminal prosecution on the proof of a *1023 past crime. "The principle back of the exclusion [of evidence of past crime] is one, not of logic, but of policy” (People v Zackowitz, 254 NY 192, 197-198). (See, also, People v Dales, 309 NY 97, 101; People v Goldstein, 295 NY 61, 64.)
While a criminal propensity can be inferred from only one crime, evidence can of course overcome the presumption of the continuance of the psychological or environmental factors that generated the crime. To begin with, "[T]he nature or circumstances of the crime committed” (Gregg v Georgia, 428 US 153, 206) may diminish its importance and must be considered in any sentencing. In the instant case, however, the circumstances of the crime indicate the likelihood that respondent will repeat it.
1. CIRCUMSTANCES OF RESPONDENT’S DELINQUENCY
Respondent first testified at the dispositional hearing that he had found the substantial quantity of heroin he was guilty of possessing and did not know what it was. On cross-examination by the Corporation Counsel, however, he testified that one "D” who has since died, had "dropped” the heroin near a subway station, where respondent picked it up. Respondent and D were following the practice adopted to impede narcotics convictions, of avoiding a personal transfer of narcotics. Respondent then sold the heroin, according to his testimony, securing the assistance of a third "dude” who handed out the heroin while respondent took in the payments (another customary device to impede narcotics convictions). Respondent had collected for heroin sales at least $250 of the $370 he possessed at the time of his arrest.
It is reasonably clear from respondent’s sophisticated methods as well as D’s entrustment to him of a substantial quantity of heroin, that he was an experienced participant in the drug traffic, and thus that respondent had a propensity to commit this type of crime. The fact that nine months have elapsed without another drug arrest is of little weight in view of the small percent of crimes for which the perpetrators are apprehended.
2. respondent’s social adjustment
Other circumstances which might refute the inference from a committed crime of a propensity to criminality, would be facts as to respondent’s life before or after the crime showing *1024 that it was an isolated deviation from social conformity. Respondent’s history, however, as detailed in the opinion filed in these proceedings, in no way refutes the inference of his propensity for crime. The likelihood of further criminality must be inferred in the case of a youth of 16 like respondent, who lives largely on the streets, with little education, self-discipline, or amenability to constructive influences in the community; and who has committed a crime showing experience in the narcotics trafile and an association with criminals.[1] It is also clear from the failure of efforts over many months to secure respondent’s participation in treatment services in the community, that he is not amenable to rehabilitation or control while free in his own home.
B. SENTENCING OR PLACEMENT OBJECTIVES
1. INCAPACITATION
Incapacitation, the minimum goal of institutionalization of an offender,[2] is an appropriate objective in respondent’s case and a justification for his placement. While the public safety would be better served by removal from the community of a major distributor of illegal narcotics than of a small one like respondent, among street distributors a youth like respondent appears to be more dangerous than an adult. Youths rather than adults are the drug salesmen in or around public schools. And a juvenile probably serves more perniciously than an adult as a criminal model for his peers, stimulating them in particular to trading in narcotics, with all the destructiveness to a juvenile entailed by participation in that traffic. The removal of juvenile drug-traders one by one from the community, however, is clearly less effective than would be changes in "the economics of the illicit marketplace”[3] through long-overdue reform of the narcotics law.
2. REHABILITATION
Rehabilitation of the offender, once viewed as the objective *1025 of juvenile delinquency proceedings, has in the past few years been condemned as a sentencing goal or a determinant of the appropriate length of a juvenile’s institutionalization.[4] To the small extent that the arguments against rehabilitation are based on experiential data, such data relates largely to adults;[5] and for reasons explained in the opinion on file in this proceeding, this court is unpersuaded that the rehabilitative goal should be discarded, at least so far as juveniles are concerned.
More vital than abstract theories on rehabilitation is the question of whether a juvenile delinquent like respondent is beyond hope of rehabilitation. The prospect of success for respondent and others placed in training schools is obviously far less than for juveniles who are so well-motivated that they seek remedial services, and willingly attend community facilities. Nevertheless, the court concurs in the probation officer’s view that a training school at least offers some chance of a change in respondent whereas his present life offers none. The school (about which the court took testimony) will afford him a remedial education (with 7 to 12 students per class), vocational training, counselling, group therapy, and young men counsellors to serve as noncriminal models.
Respondent’s Law Guardian argues, correctly, that respondent is likely to reside with youths who have committed crimes of violence. The court cannot however concur in the Law Guardian’s suggestion that knowledge of violent crime would be a new experience for a youth like respondent who has been a sophisticated participant in the narcotics traffic, in contact with adult criminals. In the school, as compared to the street, constructive influences are present to outweigh the destructive. Over sufficient time they may divert respondent from his present course.
3. DETERRENCE
In recognition that incapacitation — removal of an offender *1026 for a limited time — has only minimal effect on the incidence of crime, "specific” and "general” deterrence (referring respectively to deterring the offender from further crime upon his release and deterring other potential offenders) are traditional sentencing goals.[6] It is dubious that the juvenile justice system could be organized to perform this role successfully in view of the risk-taking, thoughtless impulsivity, bravado, or vulnerability to peer pressure exhibited by juvenile delinquents. In any event, for reasons stated in the opinion on file in this proceeding, it is clear that no substantial degree of deterrence can be accomplished under the present pattern of administration of juvenile justice in narcotics cases.
Thus, while respondent’s placement is justified by the allied purposes of incapacitation and rehabilitation, the goal of deterrence does not support this measure.
C. LENGTH OF PLACEMENT
The court is authorized by the Family Court Act to make a placement with the Division for Youth for 18 months, extendible yearly thereafter on notice, hearing and good cause shown to the age of 18; or a three-year commitment (Family Ct Act, §§ 756 and 758). Title III of the Executive Law, however, authorizes a parole at any time in the sole judgment of the Division for Youth; further, through an amendment deleting the division’s power to accept commitments, the Executive Law in effect abrogated the court’s commitment authority (see Matter of Terrence C, 45 AD2d 825).[7]
The full 18-month placement period provided by the Family Court Act is ordered as the initial placement period for respondent. For an adult the crime of which respondent was found guilty is punishable by mandatory imprisonment to a maximum of 15 years (Penal Law, §§ 60.05, subd [3]; 70.00, subd 2, par [c]). Thus, the sometime criticism that juveniles suffer more severe penalties than adults for similar crimes (Matter of Gault, 387 US 1, 29), is inapplicable here.
Respondent’s release by the Division for Youth after the usual six-to nine-month residence, which has been the custom *1027 ary period prior to final parole, would be inappropriate. (The new director of the Division for Youth has indicated the possibility of some policy changes as to both final paroles and as to weekend and holiday paroles, which have also been customary.) A short period would be insufficient for respondent’s remedial education or development of skills, for genuine influence by counsellors, or even for a break in respondent’s relationship with criminals in his community. It is to be noted that the so-called "therapeutic communities” and voluntary facilities for rehabilitation of youthful offenders prescribe one and one-half to two years in the facility. If the division indeed believes during the 18-month placement that respondent is sufficiently rehabilitated to refrain from crime in the community, it has the power under title III of the Executive Law to transfer him for a trial period to an urban home or any other open facility, for which it has now rejected him as unsuitable. Respondent, as well as the community, is entitled to that measure of caution and protection, before a return of respondent to the milieu in which his delinquent conduct developed. However, this court’s views are only "precatory” under present law in relation to the Division for Youth’s parole policy (Matter of Terrence C, 45 AD2d 825, supra).

. cf. United States v Mattox (417 F Supp 343) in which a dramatic change in a defendant’s life showed he was no longer dangerous.

. See Juvenile Justice Standards Project (Amer Bar Assn-Institute of Judicial Administration, 1976), Dispositions, pp 23-26. This study, hereafter referred to as ABA Study, representing five years of work under government and private grants, analyzes the major relevant authorities.

. See ABA Study (supra, p 29), quoting as to general crime-prevention, from Wilkins, Current Aspects of Penology, 118 Proceedings of the American Philosophical Society, [1974] 235, 235-236.

. See ABA Study (supra, pp 23-43); Morris, The Future of Imprisonment: Towards a Punitive Philosophy, 72 Mich L Rev 1161, 1173; van den Haag, Punishing Criminals, 115-116, 137-142; Fox, The Reform of Juvenile Justice: The Child’s Right to Punishment, 25 Juvenile Justice 2; Fox, Philosophy and-the Principles of Punishment in the Juvenile Court, 8 Family L Q 373, 374.

. A leading authority who deprecates rehabilitation as a goal in sentencing adult criminals, views it as more appropriate for "some of our numerous young offenders.” Frankel, Criminal Sentences: Law Without Order, p 98.

. See United States v Bergman, 416 F Supp 496, 4-11; ABA Study, at p 29, quoting Rawls, A Theory of Justice, pp 3-4.

. Respondent would not be eligible for placement under the Juvenile Justice Reform Act of 1976 (L 1976, ch 878), effective February 1, 1977, which authorizes the court only in cases of certain serious crimes of violence to place juveniles directly in a secure Division for Youth school for a year.