**UNITED STATES of America,**

v.

**Bernard BERGMAN, Defendant.**

**No. 75 Cr. 785.**

United States District Court,
S. D. New York.

June 17, 1976.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for U. S.; Jeremy G. Epstein, Asst. U. S. Atty., New York City, of counsel.

Nathan Lewin, Jamie S. Gorelick, Miller, Cassidy, Larroca & Lewin, Washington, D. C., Monroe H. Freedman, East Hills, N. Y., Gustave Newman, New York City, for defendant.

## SENTENCING MEMORANDUM

FRANKEL, District Judge.

Defendant is being sentenced upon his plea of guilty to two counts of an 11-count indictment. The sentencing proceeding is unusual in some respects. It has been the subject of more extensive submissions, written and oral, than this court has ever received upon such an occasion. The court has studied some hundreds of pages of memoranda and exhibits, plus scores of volunteered letters. A broad array of issues has been addressed. Imaginative suggestions of law and penology have been tendered. A preliminary conversation with counsel, on the record, preceded the usual sentencing hearing. Having heard counsel again and the defendant speaking for himself, the court postponed the pronouncement of sentence for further reconsideration of thoughts generated during the days of studying the briefs and oral pleas. It seems fitting now to report in writing the reasons upon which the court concludes that defendant must be sentenced to a term of four months in prison.[1]

### I. *Defendant and His Crimes*

■ Defendant appeared until the last couple of years to be a man of unimpeach-

---

1. The court considered, and finally rejected, imposing a fine in addition to the prison term. Defendant seems destined to pay hundreds of thousands of dollars in restitution. The amount is being worked out in connection with a state criminal indictment. Apart from de-

ably high character, attainments, and distinction. A doctor of divinity and an ordained rabbi, he has been acclaimed by people around the world for his works of public philanthropy, private charity, and leadership in educational enterprises. Scores of letters have come to the court from across this and other countries reporting debts of personal gratitude to him for numerous acts of extraordinary generosity. (The court has also received a kind of petition, with fifty-odd signatures, in which the signers, based upon learning acquired as newspaper readers, denounce the defendant and urge a severe sentence. Unlike the pleas for mercy, which appear to reflect unquestioned facts inviting compassion, this document should and will be disregarded.) In addition to his good works, defendant has managed to amass considerable wealth in the ownership and operation of nursing homes, in real estate ventures, and in a course of substantial investments.

Beginning about two years ago, investigations of nursing homes in this area, including questions of fraudulent claims for Medicaid funds, drew to a focus upon this defendant among several others. The results that concern us were the present indictment and two state indictments. After extensive pretrial proceedings, defendant embarked upon elaborate plea negotiations with both state and federal prosecutors. A state guilty plea and the instant plea were entered in March of this year. (Another state indictment is expected to be dismissed after defendant is sentenced on those to which he has pled guilty.) As part of the detailed plea arrangements, it is expected that the prison sentence imposed by this court will comprise the total covering the state as well as the federal convictions.[2]

For purposes of the sentence now imposed, the precise details of the charges,

and of defendant's carefully phrased admissions of guilt, are not matters of prime importance. Suffice it to say that the plea on Count One (carrying a maximum of five years in prison and a $10,000 fine) confesses defendant's knowing and wilful participation in a scheme to defraud the United States in various ways, including the presentation of wrongfully padded claims for payments under the Medicaid program to defendant's nursing homes. Count Three, for which the guilty plea carries a theoretical maximum of three more years in prison and another $5,000 fine, is a somewhat more "technical" charge. Here, defendant admits to having participated in the filing of a partnership return which was false and fraudulent in failing to list people who had bought partnership interests from him in one of his nursing homes, had paid for such interests, and had made certain capital withdrawals.

The conspiracy to defraud, as defendant has admitted it, is by no means the worst of its kind; it is by no means as flagrant or extensive as has been portrayed in the press; it is evidently less grave than other nursing-home wrongs for which others have been convicted or publicized. At the same time, the sentence, as defendant has acknowledged, is imposed for two federal felonies including, as the more important, a knowing and purposeful conspiracy to mislead and defraud the Federal Government.

## II. *The Guiding Principles of Sentencing*

Proceeding through the short list of the supposed justifications for criminal sanctions, defense counsel urge that no licit purpose could be served by defendant's incarceration. Some of these arguments are plainly sound; others are not.

 The court agrees that this defendant should not be sent to prison for "rehabilitation." Apart from the patent inapposite-

---

fendant's further liabilities for federal taxes, any additional money exaction is appropriately left for the state court.

**2.** This is not absolutely certain. Defendant has been told, however, that the imposition of any additional prison sentence by the state court will be an occasion for reconsidering today's judgment.

ness of the concept to this individual, this court shares the growing understanding that no one should ever be sent to prison *for rehabilitation.* That is to say, nobody who would not otherwise be locked up should suffer that fate on the incongruous premise that it will be good for him or her. Imprisonment is punishment. Facing the simple reality should help us to be civilized. It is less agreeable to confine someone when we deem it an affliction rather than a benefaction. If someone must be imprisoned—for other, valid reasons—we should seek to make rehabilitative resources available to him or her. But the goal of rehabilitation cannot fairly serve in itself as grounds for the sentence to confinement.[3]

Equally clearly, this defendant should not be confined to incapacitate him. He is not dangerous. It is most improbable that he will commit similar, or any, offenses in the future. There is no need for "specific deterrence."

■ Contrary to counsel's submissions, however, two sentencing considerations demand a prison sentence in this case:

*First,* the aim of *general deterrence,* the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow from crimes of deception for gain like those defendant has admitted.

*Second,* the related, but not identical, concern that any lesser penalty would, in the words of the Model Penal Code, § 7.01(1)(c), "depreciate the seriousness of the defendant's crime."

Resisting the first of these propositions, defense counsel invoke Immanuel Kant's axiom that "one man ought never to be dealt with merely as a means subservient to the purposes of another."[4] In a more novel, but equally futile, effort, counsel urge that a sentence for general deterrence "would violate the Eighth Amendment proscription against cruel and unusual punishment." Treating the latter point first, because it is ·a short subject, it may be observed simply that if general deterrence as a sentencing purpose were now to be outlawed, as against a near unanimity of views among state and federal jurists, the bolt would have to come from a place higher than this.[5]

As for Dr. Kant, it may well be that defense counsel mistake his meaning in the present context.[6] Whether or not that is so, and without pretending to authority on that score, we take the widely accepted stance that a criminal punished in the interest of general deterrence is not being employed *"merely* as a means * * * ."* Reading Kant to mean that every man must be deemed *more* than the instrument of others, and must "always be treated as an end in himself,"[7] the humane principle is not offended here. Each of us is served by the enforcement of the law—not least a person like the defendant in this case, whose wealth and privileges, so long enjoyed, are so much founded upon law. More broadly, we are driven regularly in our ultimate interests as members of the community to use ourselves and each other, in war and in peace, for social ends. One who has transgressed against the criminal laws is certainly among the more fitting candidates for a role of this nature. This is no arbitrary selection. Warned in advance of the prospect, the transgressor has chosen, in the law's premises, "between keeping the

3. This important point, correcting misconceptions still widely prevalent, is developed more fully by Dean Norval Morris in *The Future of Imprisonment* (1974).

4. Quoting from I. Kant, *Philosophy of Law* 1986 (Hastie Trans. 1887).

5. To a large extent the defendant's eighth amendment argument is that imprisoning him because he has been "newsworthy" would be cruelly wrong. This thought is accepted by the court without approaching the Constitution. (See below.) The reference at this point is meant to acknowledge, if only to reject, a seemingly broader submission.

6. See H. L. A. Hart, *Punishment and Responsibility* 243–44 (1968).

7. Andenaes, *The Morality of Deterrence,* 37 U.Chi.L.Rev. 649 (1970). See also O. Holmes, *Common Law* 43–44, 46–47 (1881).

law required for society's protection or paying the penalty."[8]

But the whole business, defendant argues further, is guesswork; we are by no means certain that deterrence "works." The position is somewhat overstated; there is, in fact, some reasonably "scientific" evidence for the efficacy of criminal sanctions as deterrents, at least as against some kinds of crimes.[9] Moreover, the time is not yet here when all we can "know" must be quantifiable and digestible by computers. The shared wisdom of generations teaches meaningfully, if somewhat amorphously, that the utilitarians have a point; we do, indeed, lapse often into rationality and act to seek pleasure and avoid pain.[10] It would be better, to be sure, if we had more certainty and precision. Lacking these comforts, we continue to include among our working hypotheses a belief (with some concrete evidence in its support) that crimes like those in this case—deliberate, purposeful, continuing, non-impulsive, and committed for profit—are among those most likely to be generally deterrable by sanctions most shunned by those exposed to temptation.[11]

The idea of avoiding depreciation of the seriousness of the offense implicates two or three thoughts, not always perfectly clear or universally agreed upon, beyond the idea of deterrence. It should be proclaimed by the court's judgment that the offenses are grave, not minor or purely technical. Some attention must be paid to the demand for equal justice; it will not do to leave the penalty of imprisonment a dead letter as against "privileged" violators while it is employed regularly, and with vigor, against others. There probably is in these conceptions an element of retributiveness, as counsel urge. And retribution, so denominated, is in some disfavor as a reason for punishment. It remains a factor, however, as Holmes perceived,[12] and as is known to anyone who talks to judges, lawyers, defendants, or people generally. It may become more palatable, and probably more humanely understood, under the rubric of "deserts" or "just deserts."[13] However the concept is formulated, we have not yet reached a state, supposing we ever should, in which the infliction of punishments for crime may be divorced generally from ideas of blameworthiness, recompense, and proportionality.

### III. An Alternative, "Behavioral Sanction"

Resisting prison above all else, defense counsel included in their thorough memorandum on sentencing two proposals for what they call a "constructive," and therefore a "preferable" form of "behavioral sanction." One is a plan for Dr. Bergman to create and run a program of Jewish vocational and religious high school training. The other is for him to take charge of a "Committee on Holocaust Studies," again concerned with education at the secondary school level.

A third suggestion was made orally at yesterday's sentencing hearing. It was proposed that Dr. Bergman might be ordered to work as a volunteer in some established agency as a visitor and aide to the sick and the otherwise incapacitated. The proposal was that he could read, provide various forms of physical assistance, and otherwise give comfort to afflicted people.

No one can doubt either the worthiness of these proposals or Dr. Bergman's ability to make successes of them. But both of the carefully formulated "sanctions" in the memorandum involve work of an honorific

8. H. L. A. Hart, *supra* note 6, at 23.

9. See, e. g., F. Zimring and G. Hawkins, *Deterrence* 168–71, 282 (1973).

10. See Andenaes, *supra* note 7, at 663–64.

11. For some supporting evidence that "white-collar" offenses are somewhat specially deterrable, see Chambliss, *Types of Deviance and the*
*Effectiveness of Legal Sanctions,* 1967 Wis.L. Rev. 703, 708–10.

12. See O. Holmes, *Common Law* 41–42, 45 (1881).

13. See A. von Hirsch, *Doing Justice* 45–55 (1976); see also N. Morris, *The Future of Imprisonment* 73–77 (1974).

nature, not unlike that done in other projects to which the defendant has devoted himself in the past. It is difficult to conceive of them as "punishments" at all. The more recent proposal is somewhat more suitable in character, but it is still an insufficient penalty. The seriousness of the crimes to which Dr. Bergman has pled guilty demands something more than "requiring" him to lend his talents and efforts to further philanthropic enterprises. It remains open to him, of course, to pursue the interesting suggestions later on as a matter of unforced personal choice.

### IV. *"Measuring" the Sentence*

In cases like this one, the decision of greatest moment is whether to imprison or not. As reflected in the eloquent submissions for defendant, the prospect of the closing prison doors is the most appalling concern; the feeling is that the length of the sojourn is a lesser question once that threshold is passed. Nevertheless, the setting of a term remains to be accomplished. And in some respects it is a subject even more perplexing, unregulated, and unprincipled.

Days and months and years are countable with a sound of exactitude. But there can be no exactitude in the deliberations from which a number emerges. Without pretending to a nonexistent precision, the court notes at least the major factors.

The criminal behavior, as has been noted, is blatant in character and unmitigated by any suggestion of necessitous circumstance or other pressures difficult to resist. However metaphysicians may conjure with issues about free will, it is a fundamental premise of our efforts to do criminal justice that competent people, possessed of their faculties, make choices and are accountable for them. In this sometimes harsh light, the case of the present defendant is among the clearest and least relieved. Viewed against the maxima Congress ordained, and

against the run of sentences in other federal criminal cases, it calls for more than a token sentence.[14]

On the other side are factors that take longer to enumerate. Defendant's illustrious public life and works are in his favor, though diminished, of course, by what this case discloses. This is a first, probably a last, conviction. Defendant is 64 years old and in imperfect health, though by no means so ill, from what the court is told, that he could be expected to suffer inordinately more than many others of advanced years who go to prison.

Defendant invokes an understandable, but somewhat unworkable, notion of "disparity." He says others involved in recent nursing home fraud cases have received relatively light sentences for behavior more culpable than his. He lays special emphasis upon one defendant whose frauds appear indeed to have involved larger amounts and who was sentenced to a maximum of six months' incarceration, to be confined for that time only on week nights, not on week days or weekends. This court has examined the minutes of that sentencing proceeding and finds the case distinguishable in material respects. But even if there were a threat of such disparity as defendant warns against, it could not be a major weight on the scales.

Our sentencing system, deeply flawed, is characterized by disparity. We are to seek to "individualize" sentences, but no clear or clearly agreed standards govern the individualization. The lack of meaningful criteria does indeed leave sentencing judges far too much at large. But the result, with its nagging burdens on conscience, cannot be meaningfully alleviated by allowing any handful of sentences in a short series to fetter later judgments. The point is easy, of course, where Sentence No. 1 or Sentences 1–5 are notably harsh. It cannot be that a later judge, disposed to more leniency, should feel in any degree "bound." The

---

14. Despite Biblical teachings concerning what is expected from those to whom much is given, the court has not, as his counsel feared might happen, held Dr. Bergman to a higher standard of responsibility because of his position in the community. But he has not been judged under a lower standard either.

converse is not identical, but it is not totally different. The net of this is that this court has considered and has given some weight to the trend of the other cited sentences (though strict logic might call for none), but without treating them as forceful "precedents" in any familiar sense.

How, then, the particular sentence adjudged in this case? As has been mentioned, the case calls for a sentence that is more than nominal. Given the other circumstances, however—including that this is a first offense, by a man no longer young and not perfectly well, where danger of recidivism is not a concern—it verges on cruelty to think of confinement for a term of years. We sit, to be sure, in a nation where prison sentences of extravagant length are more common than they are almost anywhere else. By that light, the term imposed today is not notably long. For this sentencing court, however, for a nonviolent first offense involving no direct assaults or invasions of others' security (as in bank robbery, narcotics, etc.), it is a stern sentence. For people like Dr. Bergman, who might be disposed to engage in similar wrongdoing, it should be sufficiently frightening to serve the major end of general deterrence. For all but the profoundly vengeful, it should not depreciate the seriousness of his offenses.

## V. *Punishment in or for the Media*

■ Much of defendant's sentencing memorandum is devoted to the extensive barrage of hostile publicity to which he has been subjected during the years before and since his indictment. He argues, and it appears to be undisputed, that the media (and people desiring to be featured in the media) have vilified him for many kinds of evildoing of which he has in fact been innocent. Two main points are made on this score with respect to the problem of sentencing.

First, as has been mentioned, counsel express the concern that the court may be pressured toward severity by the force of the seeming public outcry. That the court should not allow itself to be affected in this way is clear beyond discussion.[15] Nevertheless, it is not merely permissible, but entirely wholesome and responsible, for counsel to bring the expressed concern out in the open. Whatever our ideals and mixed images about judges, it would be naive to doubt that judges have sometimes been swept by a sense of popular demand toward draconian sentencing decisions. It cannot hurt for the sentencing judge to be reminded of this and cautioned about it. There can be no guarantees. The sentencer must confront and regulate himself. But it bears reaffirmance that the court must seek to discount utterly the fact of notoriety in passing its judgment upon the defendant. Defense counsel cite reported opinions of this court reflecting what happens in a large number of unreported cases, by the present sentencer and many others, in which "unknown" defendants have received prison sentences, longer or shorter than today's, for white-collar or comparably nonviolent crimes. The overall run of cases, with all their individual variations, will reflect, it is hoped, earnest efforts to hew to the principle of equal treatment, with or without publicity.

Defendant's second point about his public humiliation is the frequently heard contention that he should not be incarcerated because he "has been punished enough." The thought is not without some initial appeal. If punishment were wholly or mainly retributive, it might be a weighty factor. In the end, however, it must be a matter of little or no force. Defendant's notoriety should not in the last analysis serve to lighten, any more than it may be permitted to aggravate, his sentence. The fact that he has been pilloried by journalists is essentially a consequence of the prestige and privileges he enjoyed before he was exposed as a wrongdoer. The long fall from grace was possible only because of the height he had reached. The suffering from loss of public esteem reflects a body of opinion that the esteem had been, in at least some

15. Cf. Andenaes, *supra* note 7, at 656.

measure, wrongly bestowed and enjoyed. It is not possible to justify the notion that this mode of nonjudicial punishment should be an occasion for leniency not given to a defendant who never basked in such an admiring light at all. The quest for both the appearance and the substance of equal justice prompts the court to discount the thought that the public humiliation serves the function of imprisonment.

Writing, as judges rarely do, about a particular sentence concentrates the mind with possibly special force upon the experience of the sentencer as well as the person sentenced. Consigning someone to prison, this defendant or any other, "is a sad necessity." [16] There are impulses of avoidance from time to time—toward a personally gratifying leniency or toward an opposite extreme. But there is, obviously, no place for private impulse in the judgment of the court. The course of justice must be sought with such objective rationality as we can muster, tempered with mercy, but obedient to the law, which, we do well to remember, is all that empowers a judge to make other people suffer.

## SUPPLEMENTAL SENTENCING MEMORANDUM ON ADJOURNMENT OF SURRENDER

■ The defendant moves to adjourn his surrender on the ground that interrelated plea bargains by state and federal prosecutors contemplate coordinated sentencing decisions in this and the state court. Apparently recognizing the soundness of defendant's basic position, the United States Attorney agreed last week that this court should not even impose sentence until the state court was ready to sentence on the same day. Now, however, citing the court's refusal to postpone sentencing, the United States Attorney takes a fundamentally changed position on surrender. But it was or should have been plain that this court's decision to impose sentence, and the simultaneous delay of surrender, was meant to leave time for an intervening state sentence, since it was understood that an additional state sentence might warrant some further application here. In any case, as events have developed, the propriety of postponing surrender is obvious. The reasons why this is so, given the history of these proceedings, merit some explication.

This is a case in which two prosecutors, state and federal, brought indictments charging monstrous frauds and larcenies, but then chose to deal away most of the charges in two narrowly drawn plea bargains. It is highly probable that if either prosecutor had proved even a substantial part of his charges in open court, Dr. Bergman would have faced a heavy sentence indeed. Instead of taking these charges to trial, however, the prosecutors entered into interrelated plea bargains with the defendant's counsel. Both agreements were reduced to writing, signed by the parties, and made a part of the public record.

The federal and state plea bargains provided that the Special State Prosecutor was to drop his fraud and larceny indictment altogether and only require the defendant to plead to a much narrower one charging bribery of a state legislator. (That indictment was dismissed as against the legislator. The dismissal is being appealed.) Both plea agreements provided that Dr. Bergman was to plead guilty to only Counts One and Three of the 11-count federal indictment. Although these are serious crimes, they are moderate in comparison to the full panoply of the offenses originally charged. Under the federal agreement, the defendant was permitted to plead guilty by reading a prepared statement of narrowly drawn, tightly limited admissions of fact, which were to be all the defendant would confess (and all he could justly be sentenced for). This statement contained nothing, for example, about $1.2 million or $2.5 million or any other astronomical sums of allegedly fraudulent Medicaid claims. There was certainly nothing about whether the Bergman nursing homes had given good or bad nursing care.

---

**16.** Andenaes, *supra* note 7, at 653.

This court's duty was, of course, to sentence defendant for what he had admitted, not upon accusations that were not only unproved, but that the prosecutors had agreed to drop as criminal charges. The general public could easily have misunderstood this. But the plea bargainers certainly had no reason to misunderstand. It appears, however, that there have been, putting the best face upon things, some possible misunderstandings.

As part of the plea bargain, though his case has been scheduled as the first and primary one, the Special State Prosecutor agreed to have the problem of sentencing handled by the federal court.[1] He further agreed to "recommend to the Judge of the New York State Supreme Court who will sentence Bernard Bergman on his plea of guilty to making unlawful payments to [a state legislator] that, in light of Bernard Bergman having voluntarily disclosed the facts of the crime to the Special Prosecutor and since the Federal Judge will know of these facts when he imposes sentence on the Federal charges, no sentence additional to that imposed by the United States District Court Judge on the federal indictment be imposed here."

The occasion for the application to postpone surrender is an unresolved dispute, evidently in progress for some time, over the restitution aspect of the state plea bargain. It has been agreed that the defendant "will pay to the State of New York, voluntarily, without any civil action or litigation of any kind, whatever sums of money are owing to the State of New York . . . .," the amount to be determined after accountants representing the United States, the State of New York, and the defendant have consulted and examined the relevant financial records. The Special Prosecutor has argued in the state court that the main fault for failing to reach an agreement as to the amount to be paid lies on Dr. Bergman's side. He has said that the plea agreement might well become "a nullity" if the defendant's resistance continues, and might amount after all only to "froth."

If the state plea bargain, for any reason, becomes "a nullity," serious questions will arise as to the closely connected federal bargain. If the Special Prosecutor is forced, after all, to go first, as had been planned, and prove his charges in open court, as he has thus far chosen not to do, there may be an issue as to whether the secondary federal case is barred by double jeopardy or other defenses. More significantly, the federal plea bargain and the state plea bargain are tied inseparably together. The court may not overlook the evident possibility that nullification of the state plea bargain may lead to nullification of the one here and a substantial motion to withdraw the guilty plea and vacate the sentence.

Nobody should be made to begin serving a sentence in such circumstances. Courts serve the public, to be sure. That cannot mean bowing to passing waves of popular frenzy goaded by misunderstanding.

■■■ The motion to postpone surrender is granted. Defendant will surrender to

1. Implementing the understanding that the state case would go to trial first, and might well obviate a trial of the federal case altogether, this court on September 29, 1975, deferred the federal prosecution, noting "that the central concerns of the two prosecutions relate primarily to matters of state interest." The adjournment was granted on papers that included an affidavit by the Special State Prosecutor, who pointed out that his office had conducted "a thorough investigation into alleged abuses and fraudulent practices in the nursing home industry." There was every reason to expect that the results of that investigation would be made the subjects of lawful proof, under familiar safeguards, in the state prosecution. On that anticipation, a month later this court disposed very briefly of a substantial motion in which the defendant urged that the federal indictment alleged essentially state claims and was not a valid indictment at all. In thus deciding that the motion should not be granted, this court observed that the case might well have a different aspect after the completion of the state prosecution, and that it might well prove unnecessary to consider whether there was any sufficient federal interest to pursue.

begin service of his sentence at 10:30 a. m. on July 7, 1976.

It is so ordered.[2]

---

2. Defendant has also applied to have the court recommend that his sentence be served in a halfway house. The Government opposes on seemingly sound grounds. Halfway houses serve special purposes, none of which appears pertinent to this case. The recommendation defendant seeks will not be made. Ultimately, of course, the place of confinement is for the Attorney General, through his Bureau of Prisons, not for the court.