STATE IN THE INTEREST OF C. A. H. AND B. A. R.

Argued October 6, 1981—Decided May 19, 1982.

*Alice Milmed Haller*, Assistant Deputy Public Defender, argued the cause for appellant B. A. R. (*Stanley C. Van Ness*, Public Defender, attorney).

*Ronald W. Reba* argued the cause for appellant C. A. H.

*William F. Lamb*, Assistant Prosecutor, argued the cause for respondent State of New Jersey (*Richard S. Rebeck*, Middlesex County Prosecutor, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case we must determine whether the Juvenile and Domestic Relations Court properly applied the standards of the waiver statute, *N.J.S.A.* 2A:4–48, in concluding that its jurisdiction over two juvenile offenders should not be waived. Most particularly, we must consider whether the court struck the proper balance between the statutory goals of protecting the public and encouraging the rehabilitation of offending juveniles under *N.J.S.A.* 2A:4–48(c).

The juveniles, CAH and BAR, were arrested about two months after they had allegedly gone on a crime spree during which they armed themselves, stole and destroyed an automobile, committed two armed robberies and murdered one of the robbery victims. Juvenile complaints were filed against both CAH and BAR, charging offenses which would constitute the adult crimes of automobile theft, receiving stolen property, arson, armed robbery and felony murder.

The basic facts governing this appeal were developed during a hearing before the Juvenile and Domestic Relations Court to determine whether the circumstances justified the waiver of its jurisdiction under *N.J.S.A.* 2A:4–48. Although there are some disputes, the essential facts establishing probable cause that crimes were committed appear to be as follows. On the night of May 3, 1979, the two juveniles, CAH and BAR, and a young adult, Edward Margie, decided to rob some stores in Middlesex County. BAR was then 17½ years of age, CAH just under 17, and Margie over 18 years old. When they set out, CAH took a revolver which both he and BAR knew was loaded. The two juveniles then stole a car from a dealer's lot in the Borough of Sayreville. They picked up Margie and went to a Krauszer's Food Store in Edison. Margie went into the store with the gun and committed an armed robbery. They then drove to a food service establishment, Dunkin' Donuts, and asked persons there for directions to another Krauszer's Food Store. After obtaining directions, they drove to the second Krauszer's store, located in Fords, and this time BAR took the gun and entered the store to commit robbery. He pulled the gun on the clerk, who was standing behind the counter, and demanded money from the cash register. The clerk refused, and BAR then fired the gun at the clerk's face. The shot hit the clerk in the eye and killed him. BAR then went behind the counter, opened the cash register and took the money. While BAR was rifling the register, the clerk dead at his feet "with his eye hanging out," a customer walked in and, apparently unaware of the killing and robbery in progress, asked for cold cuts. BAR told the customer that "we weren't cutting no cold cuts this time of night or something like that," and the customer left. In the meantime Margie came into the store and viewed the scene, including the dead clerk. BAR then took the money and ran back to the car, and the trio drove off. The young men drove onto a deserted road and destroyed the car by setting it on fire. CAH then took back his gun, and he and BAR stole another vehicle and fled. They were not arrested until two months later in Salem County, at which

time they were travelling to Florida. When apprehended, they had the murder weapon with them.

The waiver statute, *N.J.S.A.* 2A:4–48, provides that the juvenile court may waive jurisdiction if the juvenile is over 14 years of age, has committed a crime of a particular character and, further, the protection of society, together with the absence of any reasonable prospects of rehabilitation of the juvenile by the time he reaches 21 years of age call for waiver and referral of the juvenile for prosecution as an adult.

When the matter was first presented to the judge of the Juvenile and Domestic Relations Court in this case, she concluded that the first two criteria of the waiver statute, *N.J.S.A.* 2A:4–48(a) and (b), relating to minimum age and the nature of the offense, were clearly met. With respect to the criteria of *N.J.S.A.* 2A:4–48(c), the judge felt that the only unresolved issue concerned rehabilitation. She concluded on the basis of expert testimony that "some reasonable prospect of rehabilitation exists" for the juveniles prior to their reaching the age of twenty-one. Because the juveniles were homicide offenders and would be "contained" under an indeterminate-to-life term "so long as 'rehabilitation' requires," the court concluded that the second requirement under *N.J.S.A.* 2A:4–48(c), the "adequate protection of society," was also satisfied.

On appeal the Appellate Division concluded that it was not possible to discern from the lower court's general findings whether the appropriate statutory standard had been applied, particularly the "standard [which] requires that significant weight be given to the safety and welfare of the public and the nature of the offense." 178 *N.J.Super.* 157, at 161. The court also stressed the lack of clarity and a possible misapprehension on the part of the trial judge regarding the statutory standards of rehabilitation and its interrelation with the protection of society under *N.J.S.A.* 2A:4–48(c). It noted the apparent inconsistency in the lower court's opinion that, on the one hand, the juveniles had a reasonable prospect for rehabilitation before

reaching age 21 and that, on the other, they would or could be subject to indefinite incarceration. *Id.* at 162. The appellate court accordingly remanded the matter to the juvenile judge for detailed findings of fact and conclusions of law concerning each juvenile.

The juvenile court then submitted additional findings and conclusions. It stated that it had previously weighed the requirements concerning adequate protection of the public and the realistic rehabilitation of the juveniles. It found generally that the Juvenile Homicide Unit at Yardville was both successful in rehabilitating juvenile homicide offenders and adequate to provide maximum security. The court considered conflicting expert testimony as to each juvenile. It concluded that, as to both juveniles, there was "a realistic possibility of successful rehabilitation by 21" through the use of the Yardville facilities and services. The court also concluded that "[a]dequate protection of the public" depends on rehabilitation and, since the juveniles could be sentenced to indeterminate terms for life, "containment" of the juveniles in a secure institution would continue "for as long as the safety and welfare of the public requires."

In reviewing that determination, the Appellate Division noted that the juvenile court again had failed to indicate specifically any consideration of the nature of the offenses, of the events surrounding the homicide and of the interest of society served by deterring future crime. Nevertheless, the Appellate Division assumed that the trial judge did make such an evaluation. Although it acknowledged that it would not have refused waiver as a matter of original jurisdiction, the Appellate Division affirmed the decision of the juvenile judge, concluding that her detailed findings were minimally sufficient to support the refusal to waive jurisdiction. The matter is now before this Court on the juveniles' motion for reconsideration of our previous order in which, after granting the State's motion for leave to appeal, we summarily reversed the lower court decisions.

This case requires us to explain how the statutory standards of *N.J.S.A.* 2A:4–48 are to be applied in order to determine whether the jurisdiction of the Juvenile and Domestic Relations Court should be waived. We now hold that the statutory criteria concerning the age of the juvenile and the nature of the crime, *N.J.S.A.* 2A:4–48(a) and (b), are not only applied separately but are also relevant in applying the criteria relating to the protection of the public and the rehabilitative prospects of the juvenile offender in *N.J.S.A.* 2A:4–48(c). We further hold that the criterion in *N.J.S.A.* 2A:4–48(c) concerning the protection of society requires that the waiver decision must include consideration of the goals of deterrence and punishment, as well as physical security against harm from the offender. Finally, we hold that under the second statutory criterion in *N.J.S.A.* 2A:4–48(c), that to justify waiver there must be "no reasonable prospects" for rehabilitation, two successive determinations may be required. The first is whether rehabilitation can realistically be achieved through available facilities by the time the juvenile reaches age 21. If, but only if, there is a realistic prospect for such rehabilitation, the juvenile court must then determine whether the need for deterrence in the given case outweighs the evidence in favor of rehabilitation.

## I

The waiver statute, *N.J.S.A.* 2A:4–48 specifically provides:

* * * The juvenile and domestic relations court may, without the consent of the juvenile, waive jurisdiction over a case and refer that case to the appropriate court and prosecuting authority having jurisdiction if it finds, after hearing that:

    a. The juvenile was 14 years of age or older at the time of the charged delinquent act;

    b. There is probable cause to believe that the juvenile committed a delinquent act which would constitute homicide * * * if committed by an adult or committed an offense against the person in an aggressive, violent and willful manner * * * and

    c. The court is satisfied that adequate protection of the public requires waiver and is satisfied there are no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority by use of the procedures, services and facilities available to the court.

The statute thus contains four basic standards to be applied in a juvenile waiver determination. These relate to (1) the age of the juvenile; (2) the kind of crime committed; (3) the protection of the public and (4) the prospects for rehabilitation of the juvenile. See *State v. Lueder*, 74 *N.J.* 62 (1977).

Because the Juvenile and Domestic Relations Court determined on an adequate record that the requirements as to age and nature of the offense under the statute, *N.J.S.A.* 2A:4–48(a) and (b), had been met, no dispute is raised as to the correctness of these determinations. Rather, the dispute herein centers upon the appropriate weight to be given these factors as they relate to the protection of the public and rehabilitation under *N.J.S.A.* 2A:4–48(c) and, in turn, how the standards of subsection (c) are to be related to one another in reaching the ultimate determination of whether waiver of juvenile court jurisdiction is required. We therefore turn directly to a consideration of *N.J.S.A.* 2A:4–48(c).

Under the waiver statute the juvenile court must determine whether waiver of its jurisdiction is necessary in order to insure the "adequate protection of the public." As reflected in both of its opinions, the juvenile court apparently entertained the one-dimensional view that the statutory concept of "adequate protection of the public" entails merely safety or physical security from the offender. The court assumed that as long as the juvenile offender could be physically isolated from the public through containment or incarceration, the statutory requirement that society be protected would be met. The court apparently theorized that since a juvenile adjudicated a delinquent for having committed a homicide would be sentenced to an indeterminate-to-life term, the offender could be contained until rehabilitated and would, therefore, be eligible for release only when he no longer posed a threat to society. For that reason the court concluded that the "adequate protection of the public" did not require adult criminal prosecution of the juveniles.

The Appellate Division quite properly spotted the flaws in this position. 178 *N.J.Super.* at 162. One fallacy in the reasoning is its assumption that parole, and inferentially pre-parole incarceration, for juvenile homicide offenders is identical to that for adults and, hence, protection of society in terms of physical safety is equally well served by juvenile court disposition. As an historical matter, juveniles accused of violent, aggressive and willful crimes have not been incarcerated for as long as individuals handled in the adult system. See Rosen and Mariani, "Juvenile Justice Waiver Standards in New Jersey," 3 *Seton Hall Legis. J.* 62, 91–92 (1977). Therefore, the court's conclusion that society will be adequately protected merely through juvenile system containment is dubious.

A second and more serious problem with the reasoning is its failure to recognize that deterrence, in both its societal and individual senses, is the key to the proper understanding of the statutory concept of the "adequate protection of the public" under *N.J.S.A.* 2A:4–48(c). The Appellate Division assumed that the juvenile court's failure to refer to deterrence was mere inadvertence. It is evident, however, that deterrence was either not considered by the juvenile court in its waiver decision or, if it was, it was incorrectly balanced against the rehabilitative prospects of the juveniles.

Deterrence has been repeatedly identified in all facets of the criminal justice system as one of the important factors to be taken into account in the treatment of offenders. One of the objectives in treating convicted offenders is to fashion a sentence that will serve to prevent future crime by him as well as by others through its deterrent impact. See *State v. Jones*, 66 *N.J.* 563, 568 (1975). See also *N.J.S.A.* 2C:44–1(a)(9). Thus, the concept of deterrence involves the notion of "individual deterrence"—that punishment will dissuade the offender from repeating his criminal acts. *State v. Ivan*, 33 *N.J.* 197 (1960). It also includes the principle of "general deterrence"—that punishment can "discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim

consequence of imprisonment is likely to follow from [certain crimes]." *United States v. Bergman*, 416 *F.Supp.* 496, 499 (S.D.N.Y.1976); *State v. Wentworth*, 118 *N.H.* 832, 395 *A.2d* 858, 864 (1978).

The deterrence doctrine, as a penal tool, is both flexible and relative. Its usefulness will vary in both its individual and societal applications in relation to the crime and the criminal involved in the particular circumstances. Since the goal of deterrence is to. thwart future crimes and to modify the conduct both of the offender and others who might commit offenses, it constitutes a much more potent factor in the treatment of persons who have committed crimes which are perceived to be avoidable or preventable. See *State v. Pickell*, 136 *N.J.Super.* 340, 342 (App.Div.1975). Such crimes are usually those which result from volitional, deliberate and nonimpulsive behavior. This type of criminal behavior is presumably capable of being modified or reversed by punishment. *Id.; State v. Crescenzo*, 114 *R.I.* 242, 332 *A.2d* 421, 433 (1975). It is assumed that a person who has committed such a crime weighs the consequences of his actions and, if punished severely for his criminal act, will avoid its repetition. *Bergman*, 416 *F.Supp.* at 500. We also expect that strict punishment in such circumstances will be a vicarious penal lesson to other similarly disposed persons, who will be deterred from engaging in criminal acts.[1] *Id.*

---

[1]Conversely, if the crime and the offenders do not disclose purposeful or deliberate conduct, the success of deterrence through punishment is diminished and its need is proportionately reduced. This approach is reflected in the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:44–1(b), which lists the operative factors to be considered in determining the appropriate sentence to be imposed on a person who has been convicted of an offense. These include: (1) the defendant's conduct neither caused nor threatened serious harm; (2) the defendant did not contemplate that his conduct would cause or threaten serious harm; (9) the character and attitudes of the defendant indicate that he is unlikely to commit another offense, and (13) the conduct of a youthful defendant was substantially influenced by another person more mature than the defendant. The comment to this section expressly notes that these factors have a bearing both on whether the defendant is a source of future

Deterrence as a tool and goal in the treatment of offenders does not stand alone. In determining the appropriate penal disposition, a court must weigh the need for justice and fairness to the individual against the need for deterrence which serves primarily society's demands for justice. This discretionary, balancing process necessarily focuses on the quality of the conduct underlying the crime. It was aptly described by Chief Justice Weintraub in *State v. Ivan*, 33 *N.J.* at 201–02 as follows:

> [T]he judge must decide in what way the interest of the public will best be served. He seeks justice to society as well as to the individual, and of course justice to the individual is itself a phase of justice to the community. If the offense has strong emotional roots or is an isolated event unassociated with a pressing public problem, there is room for greater emphasis upon the circumstances of the individual offender. On the other hand, if the crime is a calculated one and part of a widespread criminal skein, the needs of society may dictate that the punishment more nearly fit the offense than the offender. There the sentencing judge may conclude he should give priority to punishment as a deterrence to others and as an aid to law enforcement.

See also *State v. Leggeadrini*, 75 *N.J.* 150, 158 (1977).

These principles have pertinency in the administration of juvenile justice. The juvenile justice system, however, places much greater emphasis upon rehabilitation than does its counterpart, the adult criminal justice system. *State v. Monahan*, 15 *N.J.* 34, 45 (1954). Rehabilitation has traditionally played a key role in the treatment of young offenders. *State v. Smith*, 32 *N.J.* 501, 530 (1960); *In re Lewis*, 11 *N.J.* 217, 224 (1953).

Nevertheless, the concept of deterrence and the need to balance individual justice with the needs of society—a balancing process that is basic and fundamental to the general scheme of the criminal law—also have a place in the juvenile justice system. *State in the Interest of B. C. L.*, 82 *N.J.* 362 (1980). The major difference between the adult and juvenile systems is one of degree, reflecting the fundamental distinctions to be made between adult and juvenile offenders. Therefore, while the salient differences between youth and maturity may affect

---

danger to the public and on the "relative necessity of a strong sanction for deterrence purposes."

the balance that is ultimately struck in a given case between punishment and deterrence on the one hand and leniency and rehabilitation on the other, those distinctions neither obviate the need to perform the weighing process nor do they alter the ingredients which go into the balancing equation.

Deterrence is as relevant a consideration in the juvenile waiver setting as it is in other areas of the juvenile justice scheme. *E.g., B. C. L.* It finds its way into the waiver scheme through *N.J.S.A.* 2A:4–48(c). The "adequate protection of society" standard in this provision of the waiver statute, by reasonable implication, encompasses the deterrence doctrine. *State in the Interest of B. T.*, 145 *N.J.Super.* 268, 278 (App.Div.1976), certif. den. 73 *N.J.* 49 (1977). See *State v. Van Buren*, 29 *N.J.* 548, 557 (1959). *Cf. B. C. L.*, 82 *N.J.* at 378 (deterrence is an important consideration in disclosure statute applicable to juveniles). If that statutory standard related only to the safety of the public from the juvenile offender, the waiver system would be seriously deficient, incomplete and inconsistent with the general principles of penology. The deterrence doctrine in the waiver setting serves generally the same purpose as it does with respect to the sentencing or disposition of adjudicated offenders—it discourages future offenses through punishment. Consequently, in the context of a waiver determination, the demands for deterrence are strengthened in direct proportion to the gravity and harmfulness of the offense and the deliberateness of the offender. As these and similar factors militating in favor of deterrence multiply in number and weight, the need for deterrence becomes increasingly more compelling.[2]

---

[2]Serious, harmful and calculated offenses typically call for deterrence. Rehabilitation, the second goal to be served by the juvenile waiver scheme, is more appropriately reserved for cases involving "relatively minor antisocial conduct of juveniles." Statement accompanying *L.*1973, *c.* 306, § 7 (*N.J.S.A.* 2A:4–48). See also Rosen and Mariani, "Juvenile Justice Waiver Standards in New Jersey," 3 *Seton Hall Legis.J.* 62, 99 (1977).

This case underscores the need for deterrence in the context of juvenile jurisdiction waiver. The gravity of the crimes and the purposeful, calculated and aggressive criminal behavior by juvenile offenders close to 18 years old are all factors present in this case. Taken in combination, they strongly impel a need for deterrence. See, *e.g., Van Buren*, 29 *N.J.* at 557–60; *B. C. L.*, 82 *N.J.* at 377–78; *B. T.*, 145 *N.J.Super.* at 276–77. However, as already mentioned, the juvenile court focused almost exclusively upon safety as the relevant concern in ascertaining whether adequate protection of the public required waiver. There was little, if any, consideration of deterrence, either as punishment for and deterrence of the individual juvenile or as a means of discouraging others from committing similar crimes in the future. See *Bergman*, 416 *F.Supp.* at 498–500; *Wentworth*, 395 *A.* 2d at 864. We are satisfied that the court erred in failing to consider the compelling need for deterrence in this case as part of its findings regarding the adequate protection of the public.

II

The trial court's failure both to weigh the evidence bearing upon the statutory goal of deterrence and to find a compelling need for deterrence in this instance, does not in itself lead to the conclusion that the ultimate decision not to waive juvenile court jurisdiction was incorrect. The protection of society is only one of two standards under *N.J.S.A.* 2A:48–4(c). The other is the rehabilitative prospects of the juvenile.

The analysis required under this part of the waiver statute is two-fold. The court must determine initially whether there are "no reasonable prospects" for the rehabilitation of the juveniles before reaching the age of 21, in light of the resources available for rehabilitation. If it concludes that there are no such reasonable prospects for rehabilitation, the analysis is complete and waiver is justified, assuming the other statutory criteria are met. On the other hand, even if the juvenile court finds that there are reasonable prospects for rehabilitation, the court must

then determine whether the prospects for rehabilitation overcome the public's need for deterrence in the given case.

Admittedly, the waiver statute, particularly *N.J.S.A.* 2A:48–4(c), can be read to suggest that once the initial finding is made that there is a reasonable prospect for rehabilitation in light of available resources, waiver of jurisdiction is inappropriate. It is therefore pardonable that the juvenile court so applied the statute in this case. The more sensible understanding of the statute, however, calls for a balancing of the prospects for rehabilitation with the need for deterrence. In the absence of such a balancing process, there would be no way, in reaching a proper and reasoned decision as to waiver, to reconcile findings of fact that supported both the need for deterrence and the rehabilitative potential of the juvenile. Furthermore, weighing these factors comports with the view that considerations of deterrence, punishment and rehabilitation should be integrated in reaching an appropriate disposition for the offender as an individual, *e.g., Van Buren,* 29 *N.J.* at 556–58, as well as counterbalanced to reach a proper accommodation between the demands for individual and social justice, *e.g., Ivan,* 33 *N.J.* at 201–02. This interrelationship between deterrence and rehabilitation may also be suggested by their joint inclusion in the same provision of the waiver statute (4–48(c)), in contrast to the separate enumeration of the statute's other criteria in separate provisions (4–48(a) and (b)).

In this case the Juvenile and Domestic Relations Court determined that there were reasonable prospects for the rehabilitation of the juveniles by the time they would reach the age of 21, taking into account available facilities and resources. The court quite correctly considered testimony relating to the "procedures, services and facilities available to the court" for purposes of rehabilitation, as required under *N.J.S.A.* 2A:4–48(c). Mr. Germershausen, who is in charge of the Juvenile Homicide Unit (JHU) at Yardville, testified that this facility had been in existence for 2½ years and he described its educational, vocational, psychotherapeutic and recreational programs. He be-

lieved the individuals in the program make positive behavioral changes; and based upon this, as well as the lack of recidivism among its parolees, he felt the program was a success. Other experts testifying on behalf of the juveniles also concluded that the resources and facilities of the JHU generated genuine rehabilitative prospects for the juveniles, although some of these experts were not directly familiar with the JHU program.

The juvenile court also considered extensive expert medical testimony concerning the amenability of the juveniles to rehabilitation. With respect to BAR, Dr. Kuvin, a psychiatrist, testified that the juvenile suffered from a "conduct disorder, socialized aggressive," characterized by a "persistent pattern of aggressive conduct." According to Dr. Kuvin, BAR was not psychotic or schizophrenic and had no thought disorder. Dr. Krakoff, a psychologist, testified that BAR was not a schizophrenic but suffered from an aggressive conduct disorder in which the rights of others or major social norms were violated. Finally, Dr. Cohen, a psychiatrist and a former consultant to the juvenile programs at Yardville, characterized BAR as suffering from a post-traumatic stress reaction following the homicide, characterized by feelings of guilt, anguish and fear, with characteristics of anti-social behavior without being an anti-social personality. In contrast, Mr. Borelli, a clinical psychologist at the Middlesex Detention Facility, testified for the State that BAR was psychotic, an acute paranoid schizophrenic. Dr. Oliver-Smith, a psychiatrist also testifying for the State, concluded that BAR was an anti-social personality with depressive and paranoic trends, explosive and impulsive with homicidal and suicidal tendencies.

The expert testimony regarding CAH reflected similar professional differences. Dr. Apffel, a psychiatrist at the Essex County Youth House, testified on behalf of CAH that the juvenile had an adjustment disorder that consisted of inappropriate reaction to stress and feelings of insecurity. According to Dr. Apffel, CAH was impulsive and had difficulty censoring his

own behavior. Mr. Borelli concluded that CAH had "a borderline adjustment and impulsive personality style, and there was some suicide risk present," which meant that CAH tended to act impulsively, rather than thinking before he acted, and had at times quite poor judgment about his own conduct. Dr. Oliver-Smith diagnosed CAH as having a learning disorder and an adjustment reaction of adolescence with a passive-aggressive personality.

The experts who concluded that there was some prospect for the rehabilitation of both juveniles were particularly impressed with the real or presumed feelings of guilt and remorse exhibited by the juveniles. Thus, according to Dr. Kuvin, BAR's feelings of remorse were of "prime importance." Dr. Krakoff believed that BAR experienced too much remorse to be considered an anti-social personality. Dr. Cohen felt that BAR was "truly troubled by what happened" and that his emotions of remorse were genuine. Dr. Apffel also focused on CAH's remorse as a positive indicator.[3]

The juvenile court weighed these opinions and concluded that the juveniles exhibited rehabilitative potential. Nevertheless, there were striking omissions in the testimony offered by most of the experts. There was almost no consideration or explanation of either the gravity of the crimes or the pattern of criminal behavior. These crimes reflect premeditated, calculated and purposeful action, a readiness to break the law and to inflict physical harm on others. The juveniles exhibited a callousness over the actual taking of a life and an apparent intractability in refusing to surrender to the legal system either

---

[3]Both of the State's witnesses testified that CAH could be rehabilitated by the time he reached 21. Even if their opinions support the ultimate conclusion that there was a realistic prospect for CAH's rehabilitation, this is not dispositive. The failure of these experts to address crucial factors in making their assessments detracts substantially from the weight which should be accorded their testimony. See infra at 341–344.

for help or appropriate juvenile treatment.[4] The experts' failure to deal sufficiently with the inferences that spring from the nature and the surrounding circumstances of the crimes committed and to relate such factors to the individual juvenile's capacity for genuine rehabilitation, leaves such expert opinion wanting. See *Dwyer v. Ford Motor Co.*, 36 *N.J.* 487, 494–95 (1962).

Further, the experts gave virtually no weight to the past records and backgrounds of the juveniles. For example, BAR had a prior record of juvenile complaints (some of which were dismissed), including an assault and battery on another teenager, kicking out the windshield of an automobile and breaking and entering an automobile to steal a pocketbook. CAH's record contains numerous prior complaints for breaking and entering and larceny, breaking a plate glass window, possession of burglary tools, possession of stolen goods, assault upon a police officer, and disorderly conduct. While these brushes with the law might not appear serious in isolation, they at the very least constitute relevant evidence of a negative attitude toward the law and a bent toward anti-social, harmful behavior. *Cf. State v. Humphreys*, 89 *N.J.* 4 (1982) (in determining eligibility for criminal diversion, court may consider reliable evidence of antisocial conduct and manifested attitude toward law); *State v. Green*, 62 *N.J.* 547, 566–72 (1973) (in sentencing, court may consider defendant's arrest record as evidence of attitude to-

---

[4]There was insubstantial evidence that the crimes were the product of behavior caused by the effects of drugs or alcohol. Neither CAH nor Margie claimed to have been under the influence of alcohol or narcotics when they committed these crimes. While there was some evidence of BAR's use of drugs, it was not demonstrated that he was under their influence at the time of the crime. Furthermore, BAR's drug use was not objectively or independently corroborated, and some expert opinion considered his testimony as to his drug habits to be exaggerated. Additionally, Drs. Cohen and Krakoff totally minimized the violent and aggressive nature of BAR's conduct following the commission of the crimes—getting into numerous fights both with friends and strangers and physically beating his girl friend—except to consider them as evidence of a subjective need for punishment and expressions of guilt.

ward law); *State v. Marzolf,* 79 *N.J.* 167, 179–81 (1979) (court should consider "whole person" in sentencing, including reliable evidence of criminal conduct not otherwise the basis of a conviction). The past record, background and experience of a juvenile offender are clearly relevant in assessing rehabilitative potential for purposes of a waiver determination. The failure to consider such information or to explain its significance renders suspect any expert opinion concerning amenability to rehabilitation.

■ Obviously, the court was not required to give controlling effect to the testimony of the experts. See *State v. Bertone,* 39 *N.J.* 356, 367–70 (1963); *State v. Scelfo,* 58 *N.J.Super.* 472, 477–78 (App.Div.1959), certif. den. 31 *N.J.* 555 (1960). See also, *Eddings v. Oklahoma,* —— *U.S.* ——, 102 *S.Ct.* 869, 881–82, 71 *L.Ed.*2d 1 (1982) (Burger, C. J., dissenting). Expert testimony need not be given greater weight than other evidence or than it otherwise deserves in light of common sense and experience. *Id.* This tempered approach to expert testimony is equally applicable in the setting of juvenile waiver hearings. See *e.g., Matter of G. D. C.,* 581 *P.*2d 908, 911 (Okl.Cr.App.1978). However, to the extent that the court relied upon expert testimony in reaching a final determination as to the prospects for rehabilitation of these juveniles, it was required to disclose its reasoning for doing so.[5] See *State in the Interest of J. M.,* 57 *N.J.* 442, 445 (1971); *B. T.,* 145 *N.J.Super.* at 274, 279; *R.* 3:29.

[5] The ultimate objective of the waiver hearing is to determine whether prospects for rehabilitation, medically-based or otherwise, are outweighed by consideration for the safety and welfare of the public. Psychiatrists and psychologists who testify concerning the rehabilitative prospects of juvenile offenders, however, do not concern themselves with society's need for deterrence, and indeed, this would not be a subject within their expertise. Consequently, such opinions will frequently be strongly cast in favor of juvenile treatment. *Cf. Eddings v. Oklahoma,* —— *U.S.* ——, 102 *S.Ct.* 869, 882–83 n.8, 71 *L.Ed.*2d 1 (1982) (Burger, C. J., dissenting) ("[T]he very occurrance of the crime functions as a powerful impetus [for psychiatrists and psychologists] to search for a theory to explain it.") See Szass, "Psychiatry, Ethics and the Criminal Law," 58 *Colum.L.Rev.* 183, 190–191 (1958). This tendency to focus upon what is essentially in the "best interests

We are highly skeptical as to the evidential sufficiency of the expert testimony as support for the trial court's determination that there were reasonable rehabilitative prospects for each of these juveniles by the time he would reach 21 years of age. We need not, however, explore further whether, as a matter of law, the court's determination as to the rehabilitative prospects of the juveniles lacked adequate evidential support. In the present posture of the appeal, a ruling on that particular proposition is obviated by our holding that a juvenile court is required to balance juvenile rehabilitation against the protection of society, an analytical step that was not taken below.

As we earlier adverted, the balance entailed in applying the dual standard of *N.J.S.A.* 2A:4–48(c) consists of weighing in the given case the need for deterrence against the prospects of rehabilitation. It is upon this evidential axis that the waiver decision turns.[6] As the need for deterrence increases with the

---

of the juvenile" is illustrated by Dr. Kuvin's testimony in this case wherein he explained why professional opinion is weighted in favor of rehabilitation. He stated:

> Psychiatry as opposed to law maybe is based on faith and hope, and without faith and hope psychiatry ceases to exist. Psychiatrists tend to be optimistic in that regard. There is no question about that. On the other hand, the psychiatrist also has to look at the alternative and the alternative is not having any treatment. Certainly not having any treatment is not going to aid him. Having treatment is prognostically favorable.

Consequently, while expert opinion on rehabilitative prospects is helpful and important in a waiver hearing, there must be a judicial appreciation that it may deal with only some facets of the overall inquiry. Such opinion evidence cannot be a substitute for the court's ultimate, highly discretionary decision, reached through an application of all of the statutory criteria to all of the relevant evidence, that the waiver of juvenile court jurisdiction is appropriate.

[6]The Legislature is currently considering a package of bills, A–3427—A–3431, relating to proposed changes in the juvenile laws. In particular, A–3427 proposes changes in the waiver statute. The proposed statute provides in pertinent part that on motion of the prosecutor, the court "shall" waive jurisdiction over a case if it finds that (1) the juvenile was 14 years of age or older; (2) there is probable cause to believe that the juvenile committed (a) a delinquent act or acts which if committed by an adult would constitute,

evidential accretion of such factors as the commission of a grave offense, deliberateness of conduct, an older juvenile offender, a past record of infractions, and a background of delinquency and exposure to the juvenile justice system, the more sharply will the decision veer in the direction of deterrence and waiver. It follows that with the heavy accumulation of this kind of evidence on the scales of deterrence, the proofs concerning the prospects for rehabilitation must become proportionately strong, cogent and persuasive in order to turn the decision back toward rehabilitation and nonwaiver.

Consistent with this approach, courts have recognized time and time again that the gravity of the crime, perhaps the most obvious and potent factor in favor of deterrence, may serve to overcome problematic or debatable evidence of rehabilitation. See, *e.g., United States v. Howard,* 449 *F*.2d 1086, 1091 (D.C.Cir. 1971); *United States v. E. K.,* 471 *F.Supp.* 924, 930–933 (D.Or. 1979); *Inge v. Slayton,* 453 *F.Supp.* 350, 353–354 (E.D.Va.1978), appeal dismissed, 603 *F*.2d 218 (4 Cir. 1979); *Matter of F. S.,* 586 *P*.2d 607, 613–616 (Alaska 1978); *J. T. P. v. State,* 544 *P*.2d 1270,

---

among others, criminal homicide, or (b) a crime committed when the juvenile had a previous conviction or delinquency adjudication, or (c) an offense against the person in an aggressive, violent and willful manner. It further specifically provides for waiver where:

> [t]he State has shown by a preponderance of the evidence that the nature and circumstances of the delinquent act or acts were of such a serious character that the interests of the public require waiver. However, if the juvenile can show by a preponderance of the evidence that he can be rehabilitated by the use of the procedures, services and facilities available to the court prior to the juvenile reaching the age of 19 and the court is satisfied by a weighing of all of the evidence that the reasons for the waiver are substantially outweighed by the juvenile's probability for rehabilitation, waiver shall not be granted.

The proposed statute by implication incorporates notions of punishment and deterrence as elements constituting "the interests of the public." It also increases the burden of establishing rehabilitative potential by shortening the time from age 21 to age 19. Furthermore, it makes explicit a balancing approach concerning the standards for the protection of society and rehabilitation of the juvenile, similar to that which we have found to be implied in the current law.

1278–79 (Okl.Cr.App.1975); *Matter of Kent,* 31 *Or.App.* 1219, 572 *P.2d* 1059, 1064–1065 (1977). We choose to understand the reasoning in cases that have approved the waiver of juveniles who had committed serious crimes, where evidence of rehabilitation was not impressive, as impliedly accepting the balance test of the waiver statute. *B. T.,* 145 *N.J.Super.* at 278 ("Experience has demonstrated the ineffectiveness of the rehabilitative process with juveniles who are involved in violent crimes."); *State in the Interest of J. F.,* 141 *N.J.Super.* 328, 332–333 (App.Div.1976) (protection of society is more important than a "possibility of rehabilitation;" the absence of reasonable prospects for rehabilitation could be deduced from the fact that the crime was "extraordinarily vicious.")

■ Viewed within this analytical framework—perhaps not starkly evident before today's decision—we determine that the trial court reached an incorrect decision concerning the waiver of these juveniles. It failed to consider or properly weigh all the relevant factors. See *State v. Bender,* 80 *N.J.* 84, 93 (1979). The waiver decision is a highly discretionary one and calls for fine judgment. We would therefore ordinarily remand the case for another application of the statute to the evidence in light of the considerations explicated by our decision. However, we are satisfied upon an adequate record, which requires no fresh or original factual determinations on our part, that the evidence in favor of deterrence and the need for waiver so dominates the evidence supporting the rehabilitative prospects of the juveniles that the decision for the waiver of juvenile court jurisdiction is compelled. A further remand for another determination at the trial level is therefore unnecessary.

### III

As we have noted, this matter has been heard and considered by us upon the juveniles' motion for reconsideration of our previous order, which granted the State's motion for leave to appeal and summarily reversed the judgment of the lower court.

Our present determination constitutes a grant of the motion for reconsideration. Our plenary review of the merits of the controversy brings us to the same result obtained under our previous order.

Accordingly, the judgment of the Appellate Division is reversed and the matter is remanded to the Juvenile and Domestic Relations Court for entry of an order waiving the jurisdiction of that court and referring the complaints to the Superior Court, Law Division, for the prosecution of the juveniles as adult offenders.

*For reversal and remandment*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For affirmance*—None.