754 A.2d 635

STATE OF NEW JERSEY, IN THE INTEREST
OF H.H., A JUVENILE.

Superior Court of New Jersey
Chancery Division
Family Part
Atlantic County

Decided December 17, 1999.

142

*Glenn Nearey*, Assistant Atlantic County Prosecutor.

*John J. Tumulty*, for defendant.

JACKSON, J.S.C.

The juvenile, H.H., has been charged with one count of attempted murder, a first degree offense, in violation of *N.J.S.A.* 2C:5–1

and *N.J.S.A.* 2C:11–3a(1); one count of aggravated assault, a second degree offense, in violation of *N.J.S.A.* 2C:12–1b; one count of possession of a weapon for an unlawful purpose, a third degree offense, in violation of *N.J.S.A.* 2C:39–4d; and one count of possession of a prohibited weapon, a fourth degree offense, in violation of *N.J.S.A.* 2C:39–3e.

Allegedly H.H. stabbed another juvenile in the chest, with a knife, at Oakcrest High School on January 6, 1999. H.H. was taken into custody at the school following the alleged offense, charged as indicated above, and she has been held detained in the Harborfields Youth Detention Center since her arrest. The Atlantic County Prosecutor's Office has filed a Motion to remove jurisdiction from the Chancery Division, Family Part, Juvenile Court, pursuant to *N.J.S.A.* 2A:4A–26(a). This opinion considers whether H.H. should be tried as an adult in the Superior Court, Law Division, or retained in the jurisdiction of the Chancery Division, Family Part, for trial of the offenses charged.

Based upon this Court's consideration of the evidence presented and applicable statutory and case law, this Court finds that the State's Motion to waive jurisdiction to the Superior Court, Law Division is hereby denied.

The purpose of the proceeding which has resulted in this opinion is to determine the appropriate forum for the trial of the pending charges against H.H.; guilt or innocence is not determined at this stage.

■ The prerequisites for the Juvenile Court's determination regarding the State's Motion to waive H.H. to adult court, set forth in *N.J.S.A.* 2A:4A–26a.(1) and (2), have been met by the State. The State and the defense have stipulated that H.H. was born on January 20, 1983. The alleged offense occurred on January 6, 1999. At the time of the alleged offense H.H. was fifteen (15) years old, thus satisfying the requirements of *N.J.S.A.* 2A:4A–26a.(1).

The defense has also stipulated that there is probable cause to believe H.H. committed a delinquent act which if committed by an adult would be a crime, as set forth in *N.J.S.A.* 2A:4A–26a.(2). As previously stated, H.H. has been charged with attempted murder, an offense of the first degree, and aggravated assault, as a second degree offense, both of which are also known as Chart One Offenses. With the stipulations having been entered on the record regarding the age of H.H. at the time of the alleged offense, and probable cause to believe that H.H. committed Chart One Offenses, no additional showing by the State is required in order that waiver occur. *State v. R.G.D.,* 108 *N.J.* 1 at p. 11, 527 *A.*2d 834 (1987); *N.J.S.A.* 2A:4A–26a.(1) and (2). A presumption in favor of waiver is created upon such showing by the State. *State in the Interest of A.B.,* 214 *N.J.Super.* 558, 520 *A.*2d 783 (App.Div.1987); *State in the Interest of S.M.,* 211 *N.J.Super.* 675, 512 *A.*2d 570 (App.Div.1986). Based upon the said stipulations and other evidence both testamentary and documentary, this Court finds that H.H. was over the age of 14 years at the time the offenses were allegedly committed and that there is probable cause to believe that H.H. committed a Chart One Offense.

Upon a finding that the State met its burden of showing that the prerequisites to waiver exist in this case, the burden of proof shifts to H.H. to show the probability of her rehabilitation, by use of the procedures, services and facilities available to the Court prior to her reaching the age of 19 years substantially outweighs the reason for waiver, to avoid waiver.

Before discussing the probability of rehabilitation and the weight to be given to it in this case, it would be beneficial at this point to set forth the factual background against which those issues are being considered.

Evidence presented indicates that H.H. has had no prior contact with the judicial system. She has no prior arrests and no formal or informal juvenile delinquency adjudications. She has no prior history of antisocial conduct. School records, psychological and psychiatric evaluations, and testimony presented to the Court

indicate that H.H. has been a good student obtaining good grades in honors classes and functioning on an above average intellectual level. Her report card of her academic achievement through April of 1998, during the academic year preceding the school year in which the alleged incident took place, placed in evidence as Defense Exhibit 2, indicates that she maintained a 95.875 average. She apparently has always excelled in school. She has received several certificates and awards for her academic and community activities including peer leadership, work on the homework hotline and computer club. Based upon the Court's review of her art work placed in evidence, she is also a gifted artist.

H.H. is the oldest of five children. At the time of the alleged incident H.H. resided with her maternal grandmother, her 14 year old sibling and her 9 year old cousin. One of her siblings resides with an aunt and another resides with an great aunt. H.H. has been raised by and resided with her maternal grandmother, most of her life. Her grandmother obtained legal custody of H.H. when she was two years old. H.H.'s mother had substance abuse problems, and although her mother resided in the household with H.H., her grandmother and her siblings on and off for several years, apparently her mother left the household for good in 1987. H.H.'s mother was murdered in June, 1997, in a yet unsolved homicide in which her mother's throat was cut or she was stabbed to death. Her father lives out of State and is remarried.

Police reports of the alleged incident for which H.H. has been charged indicate that on the date of the incident she had been sitting in the school cafeteria at lunch with a boy who had been her boyfriend for about a 1½ years until they broke up on December 7, 1998, which would have been approximately one month before the incident. While they were sitting in the cafeteria together, H.H. allegedly saw a note written on the bottom of the boy's Spanish vocabulary list which read "I love you". The boy advised police that upon seeing the note H.H. became angry, began to fuss and asked him who had written the note on his vocabulary list. He said H.H. thought it was written by the

alleged victim, who apparently was in the boy's Spanish class at the time, though the boy advised the police that he told H.H. the victim had not written the note.

Statements were given to the police by other students indicating that sometime between the encounter with the boy in the cafeteria and the actual incident, H.H. had shown a knife in the school gym, which she had taken from her bookbag. Just prior to the incident, H.H. is alleged to have angrily told another student that the victim and her ex-boyfriend were "messing around" and she, was going to kill "her" and cut her ex-boyfriend. She is alleged to have later told the same student that she was going to "stab her", the fellow student assumed that H.H. was referring to the victim. The same fellow student told the police that she and H.H. had been in the bathroom just prior to the incident when H.H. took the knife out of her bookbag and put it under her jacket. The fellow student told police she had been trying to calm H.H. down in the bathroom to avoid a confrontation, but when the bell rang for the next class, H.H. quickly left the bathroom before the fellow student could stop her. The fellow student told police she left the bathroom after H.H. and saw H.H. in the hallway arguing with the alleged victim, with a crowd of people gathered around H.H. and the victim instigating a fight between them. The ex-boyfriend also was there, described as nervously laughing.

The fellow student told police that she did not actually see H.H. stab the victim, but she saw H.H. pull the knife back from the victim and try to stab her again, but a teacher who had been between H.H. and the victim moved H.H. into a classroom. Several other witnesses, including the ex-boyfriend, stated to the police that H.H. stepped or reached around a teacher, who had stepped between H.H. and the victim when they were arguing, and stabbed the victim in the chest with a knife described as a 14″ martial arts knife.

Based upon police reports, testimony and a statement given by the ex-boyfriend, the ex-boyfriend had given the knife to H.H. as a Christmas present a few weeks before the incident. H.H.'s dis-

covery of the note on the bottom of her ex-boyfriend's vocabulary list and the stabbing took place on the same day, within two class periods. It does not appear that H.H. had an opportunity to leave school to get the knife after discovering the note; it appears she had the knife at school before discovering the note. H.H. told Dr. Phillip Witt, who evaluated her for the defense, that she did not bring the knife to school for the purpose of harming anyone; that her ex-boyfriend had given it to her for her protection and she had been carrying it around in her bookbag for several days prior to the incident.

According to police reports provided, H.H. told the police officer who questioned her at the school following the incident, that she did not remember the actual stabbing. She later told a police officer, who questioned her after the incident in the presence of her grandmother, that she had brought the knife to school in her bookbag days before the incident; that she recalled seeing the knife while in the gym, and going to the victim's classroom to confront her about the note she had seen on her ex-boyfriend's paper; but she could not remember what happened next and the next thing she remembers is being in a classroom with a bloody knife in her hand and being told she stabbed someone.

In an interview with Dr. Witt, H.H. similarly indicated that she did not recall the actual stabbing, although she does recall arguing with the victim and her ex-boyfriend. H.H. also told Dr. David F. Bogacki, Ph.D., who evaluated her on the issue of rehabilitation for the State, that she had limited recollection of the incident. She also advised Barbara Michalak–Reilly, D.O., a psychiatrist who evaluated her at Bridgeton Hospital where she was sent to stabilize her depression between 01/02/99 and 02/02/99, that she did not remember the stabbing.

History, taken from H.H. and her grandmother during the psychological and psychiatric evaluations performed after the incident, reveals that H.H. attempted to commit suicide on September 29, 1998, about three months before the incident, by taking 30 tylenol tablets. She was hospitalized at Shore Memorial Hospital

for four (4) days in connection with that attempt. It is alleged that she had attempted suicide a short time before then, which attempt was allegedly stopped by her ex-boyfriend. H.H.'s grandmother reports that H.H. began to manifest symptoms of depression in September of 1998, but her grandmother says she did not recognize the symptoms as depression. She says H.H. began to have nightmares, developed a fear of spiders, needed to sleep with her grandmother, became sloppy with respect to her work and her immediate environment, and developed an inability to sleep well. Her grandmother attributed the change in H.H.'s behavior to the death of her mother, who had been murdered a little over a year before, but she sought no therapy or intervention for H.H. H.H. told Dr. Witt that her depression began shortly before her mother's murder in June of 1997, because of conflicts between her mother and her grandmother.

After H.H.'s release from Shore Memorial Hospital on October 3, 1998, following her treatment in connection with the suicide attempt, her grandmother put her in therapy at the Family Service Association (FSA). A report dated January 11, 1999 from Barbara Griesman, a unit manager at Family Service Association, indicates that H.H. first presented at F.S.A. on 10/05/98 with her grandmother after discharge from Shore Memorial Hospital, following treatment for a tylenol overdose. The F.S.A. report states that H.H. first presented with a depressed mood, oriented in all three spheres, and alert although her speech was in low tones, with a flat affect, but displaying no delusions or hallucinations. The report indicates that Family Service Association staff recommended a psychiatric evaluation, but it was refused. It should be noted that, in her testimony, H.H.'s grandmother disputes that a psychiatric evaluation was suggested and refused. The F.S.A. report indicates that H.H. was seen on 10/12/98, 10/19/98, 11/09/98, 11/23/98, and 01/04/99. The report indicates that the Burns Depression Checklist was administered to H.H. on 10/12/99 with a resultant score of 21, which is at the beginning of the moderate range. On 10/26/98 the Checklist was administered again resulting in a score of 17, which is borderline mild depression. On

01/04/99 the Burns Depression Checklist was administered to H.H. again, resulting in a score of 33, which the report says is in the severe range. The report states that, with the score indicating severe depression, F.S.A. staff recommended H.H. see a doctor to discuss the possibility of prescribing anti-depressant medication.

H.H.'s grandmother testified that she had been unhappy with H.H.'s therapy at Family Service Association prior to 01/04/99, because her therapist had canceled several scheduled appointments, and in her opinion there had been no continuity of treatment. H.H.'s grandmother testified that the 01/04/99 appointment at F.S.A. had been scheduled after she complained to the therapist's supervisor about canceled appointments and a lack of continuity. She testified that she was told, for the first time, on 01/04/99 that H.H. was severely depressed, and she should take H.H. to her pediatrician to get medication. She says she took H.H. to the pediatrician on 01/05/99 but his office had closed early, and she had intended to take H.H. back to the pediatrician the next day. She testified that she contacted the pediatrician the next day, 01/06/99, and he advised her that he would not be able to write the type of prescription she required; she would have to take H.H. to a pediatric psychiatrist, and she discovered that F.S.A. had a pediatric psychiatrist, but she was not told by F.S.A. staff. As previously indicated, the stabbing incident took place on 01/06/99, approximately 1½ days after the diagnosis of severe depression by F.S.A. staff.

Upon the recommendation of Dr. Witt, H.H.'s attorney made application to the Court to allow H.H. to be transferred from Harborfields Juvenile Detention Facility to the Child/Adolescent Mental Health unit of South Jersey Hospital in Bridgeton, for a psychiatric evaluation and possible medication. The Court granted the request and H.H. entered South Jersey Hospital on 01/29/99 and was discharged on 02/02/99 with a primary diagnosis of Depression, not otherwise specified, with atypical features (reactive mood and interpersonal sensitivity), and a secondary diagnosis of Borderline Personalty Disorder with strong histrionic

features. The discharge summary also observed that H.H. still had "grief issues and losses to deal with". She was discharged back to Harborfields on Zoloft 50 mg in the morning and Trazodone 50 mg at bedtime, with direction that her primary health care provider could review her continuing need for medication, and a recommendation that H.H. "obtain a therapist who can help her strengthen her more mature defenses and help the immature defenses abate". The discharge summary was written by Barbara Michalak–Reilly, DO, MPH, a psychiatrist.

Since her return to Harborfields from South Jersey Hospital, H.H. has been seeing Cathy Cipolo, L.S.W., a therapist at Atlanti-Care Behavioral Health, once per week. She also sees a psychologist and psychiatrist at AtlantiCare, in addition to taking her anti-depression medication.

During the waiver hearing the Court heard testimony from Dr. Phillip Witt, Ph.D., licensed psychologist, presented on behalf of H.H.; and Dr. David F. Bogacki, Ph.D., A.B.P.P., licensed psychologist, presented on behalf of the State, who were the principal expert witnesses to testify on the issue of rehabilitation. Dr. Witt also rendered a report of his evaluation of H.H. dated 01/26/99 and a follow-up report to her counsel dated 04/06/99, in evidence as Defense Exhibit 24. Dr. Bogacki rendered a report dated 03/31/99, in evidence as State's Exhibit 2, which includes his evaluation of H.H. on 03/25/99 and 03/31/99.

Both Dr. Witt and Dr. Bogacki were accepted by this Court as experts with extensive clinical experience with children and adolescents. Their expertise is not an issue as far as this Court is concerned. However, for reasons that will be set forth hereinafter, this Court finds the opinion that H.H. may be rehabilitated before age 19 years, offered by Dr. Witt, to be more persuasive and sound.

In arriving at his opinion that H.H. can be rehabilitated prior to reaching the age of 19 years by use of procedures, services and facilities available to the Court, Dr. Witt utilized an individual interview with H.H.; a joint interview with H.H.'s grandmother

and H.H.'s aunt; a review of police reports of the incident which resulted in the charges; the instant delinquency complaint against H.H.; Shore Memorial Hospital records regarding H.H.'s treatment after H.H.'s 09/29/99 suicide attempt; Family Service Association records of that Agency's contact with H.H.; H.H.'s high school transcript and various awards and certificates she has received; a consultation with Wayne Ford, the Assistant Superintendent at the Harborfields Youth Detention Facility; and the Child Behavior Checklist, a psychological assessment instrument. As described by Dr. Witt in his report of 01/26/99:

"The Child Behavior Checklist (CBC) is a 112 item objective personality test that results in descriptions of the personality and behavioral characteristics of a child. The C.B.C. is administered to a parent or caretaker who is asked to respond to the questions and apply the questions to the child being evaluated. Hence the detailed parental description of the child is translated into the child's relevant personalty traits."

Dr. Witt explained that the accepted wisdom which underlies the use of the C.B.C. is that, in addition to the child being evaluated, a good source of information to form a personality profile of the child is the person that probably knows the child best, the parent or primary caregiver. Dr. Witt administered the C.B.C. to H.H.'s grandmother prior to preparing his report dated 01/26/99, since she has been the primary caregiver for H.H. since H.H. was around four (4) years old. During his testimony, Dr. Witt stated that he subsequently administered the Millon Adolescent Clinical Inventory (M.A.C.I.) to H.H. when he met with her in April of 1999, and the results were consistent with the results of the C.B.C. he had previously administered to H.H.'s grandmother. The purpose of both instruments is to develop an objective profile of H.H.'s personality.

In his report date 01/26/99, which includes his findings from the C.B.C., Dr. Witt states that generally, H.H.'s grandmother describes H.H. "As an academically and socially involved teenager, participating in a higher level of social, intellectual and athletic activities than the typical teenager". Her grandmother reported "no evidence of externalizing problems, such as delinquent or aggressive behavior". She reported no evidence of what are

termed mixed problems, such as social problems, thinking problems, or attention problems. Her grandmother did, however, describe H.H. as having a significant amount of internalizing problems. Her grandmother reported to Dr. Witt that H.H. has a very high level of somatic complaints, complaining of dizziness, weariness, aches, and headaches, and other physical symptoms. Her grandmother also described H.H. to Dr. Witt as "anxious and depressed, crying, being perfectionist, and struggling with feelings of worthlessness".

In his report dated 01/26/99 and in his subsequent testimony in Court, Dr. Witt applied eight (8) major factors to the background information he had gathered and the profile he had developed on H.H. Dr. Witt stated that the eight (8) factors he used are found, in accepted literature in the field of psychology, to be related to the risk of the commission of future serious offenses by juveniles. He used the eight (8) factors and the background information to make recommendations regarding future treatment for H.H. and to support his expert opinion that H.H. can be rehabilitated within the requirement of the statute. In reviewing the eight (8) factors as they relate to H.H. Dr. Witt stated in his 01/26/99 report that:

**Integration of findings and recommendations:**

[H.H.] Hendricks is a 16–year–old with a variety of serious charges stemming from an incident in early January when she is reported to have stabbed another high school student. Regarding [H.H.]'s risk to the community, I will organize my findings along eight major factors that have been found to be related in the literature to risk of future serious offenses:

1. **Prior offenses/delinquent behavior:** early contact with the criminal justice system, chronic delinquent behavior, and a variety of situations delinquent and rule-breaking behavior occur (such as at home, in school, and in the community) are risk factors in this area.

   [H.H.] shows none of the chronic conduct problems that are typical of most juvenile waiver cases I have seen. She has no history of prior contact with the law, no history of conduct problems as a child or adolescent, and no history of school-related difficulties, such as suspensions or disciplinary problems. On the contrary, she has been a model student and model child through most of her life.

2. **Family circumstances/parenting:** inadequate parental supervision, inappropriate or inconsistent discipline, a chaotic, disrupted family environment, and a poor relationship between the teenager and his or her parents are common family-related risk factors.

Although [H.H.]'s father reportedly has little contact with her, and [H.H.]'s mother had significant criminal and drug abuse problems, neither [H.H.]'s mother nor father had been primary caretakers for [H.H.]. The primary caretaker for [H.H.] has been [H.H.]'s grandmother, Linda Taylor, and Mrs. Taylor shows no criminal or drug abuse history. Ms. Taylor is a stable, well-adjusted individual with strong moral and religious values. Her employment history is stable. Ms. Taylor takes parenting seriously: she appropriately monitors [H.H.]'s whereabouts, enforces a curfew, and holds [H.H.] to appropriate standards of behavior.

[H.H.]'s immediate family is not without problems, however. She feels misunderstood and unsupported by her grandmother. She described the communication between them as poor.

3. **Educational/employment history:** Disruptive classroom behavior, low achievement, disciplinary infractions at school, truancy, and problems with teachers, or a poor and unstable job history (if the teenager has been working) are typical risk factors in this area.

[H.H.] shows no problems in this area. Her grades are excellent. She has numerous certificates of merit and achievement, ranging from athletics to peer leadership to computer club involvement. [H.H.] hopes to go to college, and her academic achievement supports this goal as a reasonable one. She shows none of the disruptive school behavior, disciplinary problems at school, or poor achievements that are more typical of juvenile waiver cases.

4. **Peer relations:** Lack of friends or association with delinquent friends are peer-related risk factors.

The evidence her is mixed. On the one hand, [H.H.] has had some difficulties relating to peers. She feels rejected and taunted by others. She is not a teenager with a wide circle of friends. Although her level of interpersonal conflict with peers is well within normal limits for a teenager, her level of reaction is intensified by her pre-existing depression. Nonetheless, she has maintained a long-term romantic relationship and has at least one close female friend, whose mother in fact is willing to provide care for [H.H.] should [H.H.] be released from the juvenile detention center. [H.H.] shows none of the association with delinquent peers that is typical of juvenile waiver cases I have seen.

5. **Substance abuse:** Drug or alcohol abuse (or even significant use short of abuse in younger teens) and association with substance abusing peers are risk factors in this area.

[H.H.] shows no history of substance abuse whatsoever.

6. **Leisure recreation:** Limited (or lacking) positive organized leisure activities, and lack of personal interests are risk factors in this area.

[H.H.] shows a wealth of healthy, age-appropriate, productive leisure activities. Her numerous certificates of merit from school document her positive leisure activities. Additionally, she has also been employed, despite her youth.

7. **Personality functioning:** inflated self-esteem, physical or verbal aggressiveness, a short attention span, poor frustration tolerance, and exploitiveness are typical personality risk factors.

[H.H.] shows none of the aggressiveness, exploitiveness, or self-centered attitude that would indicate chronic risk for aggression. On the other hand, during the past six months, [H.H.] has shown a number of signs of substantial depression. This depression is [H.H.]'s major risk factor regarding her potential to harm herself or others. During the past six months, she has had two suicide attempts—one serious, requiring hospitalization—and one instance of assaulting another—the instant offense. Her depression during this period has become increasingly severe to the point where just a few days prior to the instant assault, her therapist recommended she receive a medical evaluation for antidepressant medication. Although it is difficult to fully understand her reasons for stabbing the other teenager, particularly since her ability to recall and recount the actual assault is partial at best—nonetheless it is clear that this behavior is quite aberrant for [H.H.]. Her depression, in my opinion, both clouded her judgment and lowered her ability to control her aggressive actions, both towards herself and towards others. Her depression also has intensified her reaction to the normal peer conflicts or adolescence. It is this depression that requires treatment.

8. **Attitudes/orientation:** antisocial/procriminal attitudes, defiance of authority, callousness towards others, and rejection of assistance are typical risk factors in this area.

[H.H.] shows no evidence of the kind of antisocial, procriminal attitudes frequently evident in juvenile waiver cases. She has always been a compliant, cooperative child and teenager whose behavior and attitudes reflect a pro-social orientation.

In summary, the one major risk factor for [H.H.] is her depression. This depression has led to attempts to harm herself as well as, in the instant offense, another individual. Her depression has clouded her judgment.

I will address the referral questions in turn:

1. *With regard to the prosecution's motion for a waiver, can [H.H.] be rehabilitated by her 19th birthday with the resources available to the court?*

It is my opinion with a reasonable degree of professional certainty that [H.H.] can be rehabilitated with the resources available to the court by her 19th birthday. [H.H.] detailed above—shows none of the chronic aggressive, delinquent behavior typical of juvenile waiver cases. Her aggressive act was an aberration, precipitated by interpersonal conflict intensified by [H.H.]'s depression. It is primarily her depression that requires treatment. I recommend the following:

1. Psychiatric evaluation: [H.H.] may benefit from antidepressant medication. She should be psychiatrically evaluated for the appropriateness of such medication.

2. Individual psychotherapy: [H.H.] is open to receiving psychotherapy. She wants someone to talk to and confide in, which she had found lacking in her life.

3. Family therapy: Part of [H.H.]'s difficulties lie in her troubled relationship with her grandmother, her primary caretaker. [H.H.] feels unsupported by her grandmother. Any successful treatment will necessarily include her grandmother.

> Fortunately, depression is a treatable disorder, there are empirically supported methods available for treating depression, including anti-depressant medication, cognitive therapy, and interpersonal therapy. Assuming [H.H.]'s cooperation with the above treatment plan, her prognosis is good.

In deciding that H.H. can be rehabilitated prior to her 19th birthday the Court has also considered: 1) the fact that H.H. has been receiving medication for her depression since being discharged from South Jersey Hospital on 02/02/99; 2) the testimony and reports of Dr. Witt and Dr. Bogacki; 3) testimony from Harborfields Youth Detention Facility staff regarding H.H.'s demeanor and behavior while detained; and 4) testimony and reports that her demeanor and her prior dysphoric state has greatly improved since she has been on the medication. The Court also has considered the fact that H.H. has been in therapy at Atlanti-Care Behavioral Health on a weekly basis since 03/18/99 where she sees a therapist and has access to a psychiatrist and a psychologist.. Based upon testimony of Catherine Cipolla, L.C.S.W., H.H. has been making good progress in dealing with recognized interpersonal problems and her coping skills. Ms. Cipolla indicates H.H.'s coping skills were already good, but they have improved since she has been in therapy. Generally, the Court finds that H.H. already has a head start on her rehabilitation in accordance with the recommendation made by Dr. Witt.

In his report (in evidence as State's Exhibit 2) and in his subsequent testimony in Court, Dr. Bogacki renders the opinion that he is unable, to a degree of reasonable psychological certainty, to conclude that H.H. can be rehabilitated with the resources available to the Court by her 19th birthday. He bases this conclusion primarily upon his concern that H.H. was unable to recall details of her motivation for the stabbing, and secondarily upon his diagnosis of personalty disorders he suspects she is suffering from because she was unable to recall such details. In making his diagnosis of personality disorders, Dr. Bogacki also relies upon his interpretation of the results of projective psychological tests he administered to H.H. Unlike Dr. Witt, Dr. Bogacki concludes that H.H.'s primary problem is not depression, but

rather she suffers from more serious personality problems that require extensive inpatient treatment which, to his knowledge, is not available through the Court system. Dr. Bogacki's conclusions and the basis for those conclusions will be examined further hereinafter.

Prior to conducting his evaluation of H.H., Dr. Bogacki reviewed the complaint filed against H.H. and the Notice of Motion to waive H.H.; a report of Detective H. Maxwell dated 01/07/99; report of Det. Sgt. J. McKeen dated 01/11/99; records from Oakcrest High School pertaining to H.H.; medical records from Shore Memorial Hospital on H.H.'s discharge on 10/03/98; report of Off. Steven Dellaroce of 01/06/99; report of Det. Maxwell of 01/02/99; written statement of Valerie Dazemore (a student at Oakcrest High School); Hamilton Twp. Police Dept. Property report; statement of H.H.'s ex-boyfriend given to police; hospital records from South Jersey Hospital with date of discharge of 02/02/99; and psychological report of Phillip Witt, Ph.D. of 01/26/99.

Dr. Bogacki's report indicates that in making his assessment of H.H. he administered to H.H.: the Bender Visual–Motor Gestalt Test; which measures cognitive and perceptual functioning; Weschler Adult Intelligence Scale—III Edition (WAIS III) which measures how well H.H. will do in school and her cognitive ability; Wide Range Achievement Test, which measures intellectual functioning; Millon Adolescent Clinical Inventory (MACI) which is utilized to develop a personalty profile of the child being evaluated; and Rorschach, House Tree Person Projective Drawings. He indicates that he also interviewed H.H.'s grandmother and Wayne Ford (Assistant Superintendent at Harborfields Juvenile Detention Center).

As can be seen from a review of the assessment instruments used by Dr. Bogacki, several of them are used to measure intelligence or cognitive functioning. As her grandmother reports and her school records and the many awards and citations placed in evidence by the defense as Exhibits D–2 through D–21, H.H. has been an academic achiever, functioning at an above average

level academically, intellectually and in some social spheres. Dr. Bogacki reports that his screening revealed no organic brain dysfunction.

Dr. Bogacki diagnoses H.H. as suffering from Dissociative Amnesia, Depression Disorder NOS and features of paranoid personalty and Parent–Child Problem. He indicates that his primary concern with respect to H.H.'s ability to be rehabilitated within the requirements of the statute derive from her inability to recall her specific motivations, feelings or actions at and around the time of the stabbing. He advises that her failure to specifically recall the event and her thoughts or feelings at the time of the stabbing, and her inability to recall her specific thoughts or feelings during her attempted suicide, may be symptomatic of Dissociative Amnesia. He indicates that she is predisposed to develop amnesia for subsequent traumatic events. He opines that treatment of Dissociative Amnesia, if she suffers from it, would require more intense, inpatient treatment that is not available to the Court system. He further states that if H.H.'s inability to recall is simply malingered, her prognosis for rehabilitation is lessened.

However, Dr. Bogacki's concern regarding the possibility of Dissociative Amnesia, stated in his 03/31/99 report and in his subsequent testimony at the waiver hearing, appears to ignore or discount the findings made by Barbara Michalak–Reilly, DO, MPH, a psychiatrist who attended H.H. during her stay at South Jersey Hospital Child/Adolescent Mental Health Unit from 01/29/99 to 02/02/99. In her discharge summary, Dr. Michalak–Reilly reports that, because H.H. did not remember the stabbing incident, she administered the Dissociated Experience Scale (DES) test to H.H. to determine whether she suffers from Dissociative Disorder. Her report indicates that the results of the test were normal and she did not find H.H. to be suffering from Dissociative Amnesia. In reaching his conclusion that H.H. may be suffering from Dissociative Amnesia Dr. Bogacki ignores or

discounts the testing and conclusions reached by the psychiatrist at South Jersey Hospital.

With regard to the issue of Dissociative Amnesia, Dr. Witt testified that while H.H.'s inability to recall her specific state of mind or actions at the time of the stabbing incident is of some concern, it is not a primary issue in H.H.'s case. He testified that because we know from other sources, such as witness statements and police reports, that H.H. was angry at the time the incident took place and we know the surrounding circumstances including her concern and anger over a perceived relationship between the alleged victim and her ex-boyfriend, and her feeling that some of the people she thought of as friends had deceived her, we know that her anger was an underlying motivating factor that must be addressed in her treatment. He opines that the anger is treatable. Dr. Witt also opined that in all likelihood H.H. is ashamed of what she did and is merely saying that she does not remember. He testified that none of this would change his opinion regarding rehabilitation or his recommended treatment methods.

Dr. Bogacki's second general area of concern that causes him to conclude that H.H. cannot be rehabilitated within the requirements of the statute is his diagnosis of Personalty Disorder. He concludes that H.H. is "showing elements of an emerging paranoid personalty" in his report. Dr. Bogacki's report also states that H.H. under reported symptoms to the extent that he was unable to interpret the Millon Adolescent Clinical Inventory (MACI) he administered to H.H. before writing his report. It is interesting to note that this problem of under reported symptoms seems to be in direct contrast to the personalty traits of H.H. as reported to both Dr. Witt and Dr. Bogacki by H.H.'s grandmother when she stated that H.H. often reports physical and emotional complaints; an observation echoed by Dr. Malachak–Reilly when she observes that H.H. had a lot of somatic complaints. It should also be noted that Dr. Witt administered the MACI test to H.H. the month after Dr. Bogacki and reports no problem obtaining information from H.H. or interpreting the information obtained.

Dr. Bogacki reports that, because he was unable to interpret the MACI he administered to H.H., he relied upon history and interviews provided, presumably, by H.H., her grandmother and Wayne Ford, and his interpretation of the Rorschach (ink blot), and the projective house-tree drawing tests he administered to H.H., as the basis for the personalty description of H.H. contained in his report. It should be noted Dr. Witt testified that the Rorschach and house-tree drawing tests administered by Dr. Bogacki are somewhat controversial and considered to be of questionable validity in the field of psychology. During cross-examination Dr. Bogacki admitted that there is disagreement about the effectiveness of the house-tree drawing test, and that many psychologists do not believe much in the validity or effectiveness of the Rorschach test. Based upon his interviews and his interpretation of the Rorschach (ink blot) and house-tree tests, Dr. Bogacki sets forth a wide-ranging description of H.H.'s personalty in his report, concluding that H.H. suffers or may suffer from deep seeded and possibly emerging personalty problems, including paranoia. He further concludes or speculates in his 03/31/99 report that H.H.'s future behavior may deteriorate into more aggressive acts stimulated by delusional thinking.

Dr. Witt testified that while there appears to be some problems with H.H. relating to some of her peers because of distrust, he disagreed with the level or degree of paranoia portrayed in Dr. Bogacki's report. He testified that a true paranoid would not be "a pleasure to have in class" as two of H.H.'s teachers comment on her report card (in evidence as Defense Exhibit 2). He testified that a true paranoid does not get along with anyone. The Court notes that, except for statements attributed to H.H. in the police reports and her interviews, there is no evidence presented that H.H. has had great difficulty getting along with teachers or her peers. The Court notes that the police reports contained statements from several of H.H.'s fellow students who stated they had been friendly with H.H., some of them apparently for several years.

It should also be noted that, while in her discharge diagnosis Dr. Michalak–Reilly finds borderline Personalty Disorder as a secondary diagnosis to depression, her concern in that regard appears to be more directed toward the histrionic nature of the defense mechanism H.H. displayed to Dr. Michalak–Reilly. Dr. Michalak–Reilly merely recommends that H.H. obtain a therapist who can help strengthen her more mature defenses and help the immature defenses abate. She apparently found no deep seeded or particularly troubling personalty problems in H.H.

The Court also observes that H.H. has been in the Juvenile Detention Facility for several months without a problem. In fact, reports to the Court in testimony during the waiver hearing and before and after the hearings indicate that H.H. has gotten along well with staff and peers at the Detention Facility.

Dr. Bogacki concludes in his report that H.H.'s "family environment is somewhat chaotic and she has a poor relationship between she and her grandmother". He does not state the basis for his conclusion that her family environment is chaotic. However, this Court finds on the basis of testimony provided by members of H.H.'s family and other reports and material provided, that H.H. has a very stable home environment with her maternal grandmother, who took responsibility for H.H. when she was very young and has maintained that responsibility through some apparent difficulties that existed when H.H.'s drug addicted mother was alive. It is also clear to this Court that some difficulties existed with communication between H.H. and her grandmother, who besides being a real estate executive is an ordained minister, because her grandmother may have been too strict with H.H. regarding social matters. The conflicts between H.H. and her grandmother appear to this Court to be no greater or insurmountable than with many teenagers who come before the Court in a family crisis matter. The Court is satisfied that H.H.'s grandmother realizes the problems that may have been created because of the breakdowns in communication between she and H.H. which caused H.H. to begin to feel somewhat isolated. This Court is

equally satisfied, based upon interviews with H.H.'s grandmother set forth in the reports of Dr. Bogacki and Dr. Witt and her testimony in Court, H.H.'s grandmother has concern about H.H.'s best interest and is prepared to do what is necessary to see H.H. succeed.

Generally, this Court finds Dr. Bogacki's conclusions to be highly speculative with questionable objective basis. The Court finds the conclusions of Dr. Witt to be based upon objective, professionally accepted criterion and the Court, therefore, finds Dr. Witt's opinion, recommendations and conclusions to be more persuasive.

■ The Court also finds that procedures, services and facilities for the rehabilitation of H.H. prior to reaching the age of 19 are available to the Court. In the event H.H. is adjudicated in the Juvenile Court, services are available through the Juvenile Justice Commission, including but not limited to the Valentine Project which is a secure facility, geared toward addressing the academic, social and emotional needs of adolescent females. Intake involves, among other things, a psychological evaluation of each adolescent placed there, the unit provides education, treatment and custody for the females placed there. The Valentine Unit is designed to address the special needs of juvenile females offenders in the areas of mental health, gynecology/pregnancy and substance abuse. In assessing H.H.'s needs, the review process that is an adjunct to H.H.'s entry into the Valentine Unit would include her past history, evaluations and treatment.

■ Since the Court has decided that H.H. can be rehabilitated within the requirements of *N.J.S.A.* 2A:4A–26, the Court must now determine whether the prospect for H.H.'s rehabilitation substantially outweighs the reason for waiver. *State in the Interest of S.M.,* 211 *N.J.Super.* 675, 512 *A.*2d 570 (A.D.1986). In weighing H.H.'s prospects for rehabilitation against the need for punishment and the deterrence of H.H. specifically, and as a means of generally discouraging others from committing similar crimes, this Court must consider five (5) factors: the commission

of a grave offense; deliberateness of conduct; an older juvenile offender; a past record of infractions; and a background of delinquency and exposure to the juvenile justice system. *State in the Interest of C.A.H. and B.A.R.*, 89 *N.J.* at 344–345, 446 *A.2d* 93; *State in the Interest of S.M.* at p. 683, 512 *A.2d* 570.

In *State in the Interest of C.A.H. and B.A.R., Ibid.,* and quoting therefrom in *State in the Interest of S.M., Ibid.,* the Appellate Courts have given direction for the application of the above stated factors:

> As we earlier adverted, the balance entailed in applying the dual standard of *N.J.S.A.* 2A:4–4(c) consists of weighing in the given case the need for deterrence against the prospects of rehabilitation. It is upon this evidential axis that the waiver decision turns. As the need for deterrence increases with evidential accretion of such factors as the commission of a grave offense, deliberateness of conduct, an older juvenile offender, a past record of infractions, and a background of delinquency and exposure to the juvenile justice system, the more sharply will the decision veer in the direction of deterrence and waiver. It follows that with the heavy accumulation of this kind of evidence on the scales of deterrence, the proofs concerning the prospects for rehabilitation must become proportionately strong, cogent and persuasive in order to turn the decision back toward rehabilitation and nonwaiver.

> Consistent with this approach, courts have recognized time and time again that the gravity of the crime, perhaps the most obvious and potent factor in favor of deterrence, may serve to overcome problematic or debatable evidence of rehabilitation. *State in the Interest of C.A.H. and B.A.R.*, 89 *N.J.* at 344–345, 446 *A.2d* 93.

Utilizing the required factors, this Court finds that, clearly, a grave offense was committed. The type of assault alleged in this case represents a serious transgression. Police reports of the incident indicate that the victim suffered serious injuries to her liver, spleen and diaphragm, requiring emergency surgery. Clearly the offenses charged, and the act alleged to have been committed by H.H. are of the type the statute and the Courts have advised engender the need for deterrence.

The evidence presented to this Court thus far in the waiver hearing indicates that H.H. acted with purpose in committing the offence with which she is charged. However, it also appears, from the evidence presented, that H.H. was seriously depressed the day before the incident and continued to be depressed immediately

after the incident, without noticeable improvement until she received medication after her stay at South Jersey Hospital. While her depressed state may not mitigate the purposefulness of the act, Dr. Witt has testified that someone who is seriously depressed does not always think as they usually would.

As previously stated, H.H. has no prior record of contact with the Court system at any level, and no history of arrest. H.H. has no significant history of anti-social or acting out behavior against others, at home, in school or in the community, based upon the evidence presented to this Court. To the contrary, documentary evidence from teachers, the various certificates and awards, testimony from her grandmother, and Harborfields Youth Detention Facility personnel who have supervised or interacted with H.H. since the incident, show an exemplary adolescent who has exceptional intellect and artist talent. Testimony and evidence show H.H. as a motivated child who has shown a willingness to use her talents and intellect to benefit others.

While it is not necessary that all five of the factors set forth in *State in the Interest of C.A.H. and B.A.R.* be present to require waiver pursuant to *N.J.S.A.* 2A:4A–26, this Court finds that the only factor that is clearly present in this case is the severity of the offense. With the exception of the deliberateness of the act, which is not clear in this case, this Court finds that all of the remaining factors mitigate against waiver. Based upon this finding and this Court's hereinabove finding that H.H. can be rehabilitated within the time required by *N.J.S.A.* 2A:4A–26, the State's Motion to have this matter waived to the Law Division is denied.

Trial in this matter is hereby scheduled at 9:00 o'clock in the forenoon on January 31, 2000 and February 7, 2000.